# EXHIBIT B

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


FALICIA RHODES,

    Plaintiff,

vs.                        CASE NO. 2:06-cv-554-WKW

UNITED STATES OF AMERICA,

    Defendant.



* * * * * * * * * *


       DEPOSITION OF FALICIA ROSILAND RHODES, taken
pursuant to stipulation and agreement before Wendy
Lewis, Court Reporter and Commissioner for the State
of Alabama at Large, in the Law Offices of Jay Lewis,
847 South McDonough Street, Montgomery, Alabama, on
Friday, March 9, 2007, commencing at 9:10 a.m.


* * * * * * * * * *

FALICIA RHODES v. UNITED STATES OF AMERICA
DEPOSITION OF FALICIA ROSILAND RHODES

3/9/2007

2 (Pages 2 to 5)

---

Page 2

1  APPEARANCES
2  FOR THE PLAINTIFF:
3  Mr. Jay Lewis
   LAW OFFICE OF JAY LEWIS
4  Attorney at Law
   847 South McDonough Street, Suite 100
5  Montgomery, Alabama 36104
6  FOR THE DEFENDANT:
   Mr. James J. DuBois
7  Assistant United States Attorney
8  U.S. ATTORNEY'S OFFICE
   One Court Square, Suite 201
9  Montgomery, Alabama 36104
10  * * * * * * * * * *
11  EXAMINATION INDEX
12  FALICIA ROSILAND RHODES
    DIRECT BY MR. DUBOIS        4
13
    EXHIBIT INDEX
14
    DEFENDANT'S EXHIBIT NO.:
15
    1  Plaintiff's Answers to        14,92-97,101
16     Defendant's First Set of
       Interrogatories
17
    2  Complaint                23
18
    3  Photographs              32,33,43
19
    4  Baptist Health Medical   59
20     Record
21  5  Copies of Prescription   61,64,65,94
       Labels
22
    6  2/9/06 Order from        68
23     Dr. Beauchamp
24  7  List of Receipts for     87
       Medical Care
25

---

Page 3

1  DEFENDANT'S EXHIBITS continued:
2  8  Claim for Damage, Injury      90,91
      or Death Form
3
   9  Copies of Checks and          87,93
4     Receipts
5  10 Innerfit West Financial       94
      Statement
6
7  * * * * * * * * * * *
8  STIPULATIONS
9  It is hereby stipulated and agreed by and
10 between counsel representing the parties that the
11 deposition of FALICIA ROSILAND RHODES is taken
12 pursuant to the Federal Rules of Civil Procedure and
13 that said deposition may be taken before Greta H.
14 Duckett, Registered Professional Reporter and
15 Commissioner for the State of Alabama at Large,
16 without the formality of a commission; that objections
17 to questions other than objections as to the form of
18 the questions need not be made at this time but may be
19 reserved for a ruling at such time as the deposition
20 may be offered in evidence or used for any other
21 purpose as provided for by the Federal Rules of Civil
22 Procedure.
23 It is further stipulated and agreed by and
24 between counsel representing the parties in this case
25 that said deposition may be introduced at the trial of

---

Page 4

1  this case or used in any manner by either party hereto
2  provided for by the Federal Rules of Civil Procedure.
3  * * * * * * * * * *
4  COURT REPORTER:  Usual stipulations?
5  MR. DUBOIS:  Usual stipulations.  And would
6  you like to read and sign?
7  MR. LEWIS:  You have the right to read and
8  sign your deposition.  Normally we waive that right.
9  It's just another step in the process so.
10 THE WITNESS:  That's fine with me.
11 MR. LEWIS:  We'll waive it.
12 FALICIA ROSILAND RHODES
13 The witness, having first been duly sworn to
14 speak the truth, the whole truth and nothing but the
15 truth, testified as follows:
16 DIRECT EXAMINATION
17 BY MR. DUBOIS:
18 Q.  Could you please state your name for the
19 record?
20 A.  Falicia Rosiland Rhodes.
21 Q.  Ms. Rhodes, my name is Jim DuBois.  We met
22 briefly a couple of minutes ago.  I'm an Assistant
23 U.S. Attorney representing the United States in a
24 lawsuit you have filed.  I will be asking you some
25 questions this morning about your lawsuit.  If at any

---

Page 5

1  point you don't understand my questions or I don't
2  speak them clearly enough, please let me know and I
3  will rephrase them.  And if at any point in time --
4  strike that.  Please try to answer my questions
5  speaking yes or no, and don't shake your head because
6  the court reporter is trying to get a clear record
7  here.  And wait until I finish my questions before you
8  answer them.  And I'll, at the same time, extend the
9  same courtesy to you and try to wait for you to finish
10 your answers before I ask another question; is that
11 all right?
12 A.  Yes.
13 Q.  And this is not any type of endurance
14 contest.  If you have to take a break at any point in
15 time, please let me know, and I'll find a good place
16 to stop.  I only ask that you don't ask for a break
17 when there's a question on the table.  I usually take
18 a break probably about every hour or so myself, so
19 just let me know if you need one, okay?
20 A.  Yes.
21 Q.  All right.  And do you understand that today
22 you are here giving testimony under oath, and the
23 penalties of perjury apply?
24 A.  Yes, I do.
25 Q.  And are you aware of any reason that you

FALICIA RHODES v. UNITED STATES OF AMERICA                                3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

3 (Pages 6 to 9)

| Page 6 |
| --- |

1  won't be able to give me complete or honest answers to
2  my questions?
3      A.  No.
4      Q.  Besides this current lawsuit that we will be
5  talking about today, have you ever been a party in
6  another lawsuit as a plaintiff or a defendant?
7      A.  No.
8      Q.  All right.  Have you ever been a witness in
9  another lawsuit?
10     A.  No.
11     Q.  Have you ever been deposed or testified in
12  court or any kind of proceeding, legal proceeding?
13     A.  No.
14     Q.  Have you ever declared bankruptcy?
15     A.  No.
16     Q.  Have you ever been convicted or arrested for
17  any crime other than any minor traffic offenses?
18     A.  No.
19     Q.  Did you review any documents in preparation
20  for your deposition today?
21     A.  Yes.
22     Q.  And do you know which documents you looked
23  at?
24     A.  The documents that we filed for the lawsuit
25  as well and also my answers to the questions that were

| Page 7 |
| --- |

1  given to Jay Lewis.
2      Q.  Did you review any diaries or personal
3  journals you had at home?
4      A.  No.
5      Q.  Did you talk to anyone besides your attorney
6  in preparation for this deposition?
7      A.  Yes.
8      Q.  All right.  And who did you talk to?
9      A.  My best friend.
10     Q.  And who is that?
11     A.  Her name is Hermette Turner.
12     Q.  All right.  And where does Ms. Turner live?
13     A.  In Norcross, Georgia.
14     Q.  I think I've seen her name in response to one
15  of the questions we asked, so I'll ask you more about
16  her later; but when did you last speak to her?
17     A.  This morning around 6:30.
18     Q.  Do you recall the general substance of your
19  conversation?
20     A.  Yes.
21     Q.  And what was it?
22     A.  We talked about a -- her sister-in-law that
23  had just passed away, got killed in a car accident.
24  And I also informed her that I had to come here
25  today.

| Page 8 |
| --- |

1      Q.  Anything about what you would be talking
2  about at the deposition or just the fact that you had
3  to be here?
4      A.  No, just the fact that I had to be here.
5      Q.  Anyone else besides Ms. Turner?
6      A.  No.
7      Q.  All right.  Now, since this lawsuit has been
8  filed, have you sent any letters or email or any other
9  correspondence to anybody where you discussed the fall
10  that this lawsuit is about or any of the medical
11  treatment you've received?
12     A.  No one but my mother.  I just talked to her.
13     Q.  How about sending any correspondence to her?
14  Did you write any letters or emails to her?
15     A.  No.
16     Q.  What is your date of birth?
17     A.  ████████
18     Q.  Do you have any nicknames or aliases?
19     A.  I have -- my nickname is Lisa.
20     Q.  Do you generally go by Lisa?
21     A.  No.
22     Q.  Is your Social Security number 4████████?
23     A.  Yes.
24     Q.  And where do you currently live?
25     A.  At 438 -- 4338 Lawnwood Drive.

| Page 9 |
| --- |

1      Q.  How long have you lived there?
2      A.  One year and two months.
3      Q.  And is that in Montgomery, Alabama?
4      A.  Yes.
5      Q.  And who else, if anyone, shares that -- is
6  that a house or apartment?
7      A.  A house.
8      Q.  Who else, if anyone, shares that house with
9  you?
10     A.  My son, who is 15 years old, and my daughter,
11  who is 11.
12     Q.  And where did you live before you lived at
13  that address?
14     A.  I lived at 247 Eastdale Road South, Apartment
15  B.
16     Q.  In Montgomery, Alabama?
17     A.  Yes.
18     Q.  How long did you live at that address?
19     A.  One year and one month and a half.
20     Q.  Is that also a house?
21     A.  It's an apartment.
22     Q.  Apartment?  Now are those both one-story
23  dwellings?
24     A.  No -- the current place where I live is.  The
25  apartment is not.  They have two-story.

FALICIA RHODES v. UNITED STATES OF AMERICA                                    3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

4 (Pages 10 to 13)

| Page 10 | Page 12 |
|---|---|
| 1   Q. And is it the same, your two children live at<br>2 that house with you as well?<br>3   A. Yes.<br>4   Q. Anyone else?<br>5   A. No.<br>6   Q. And just one more address before that, where<br>7 did you live before?<br>8   A. 705 Roy Parker Road in Ozark, Alabama.<br>9   Q. How long did you live there?<br>10  A. Three years.<br>11  Q. Anyone live with you there besides your two<br>12 children?<br>13  A. No.<br>14  Q. Now, are you currently married?<br>15  A. No.<br>16  Q. Have you been married before?<br>17  A. Yes.<br>18  Q. What was your former spouse's name?<br>19  A. Glenn A. Walker.<br>20  Q. Did you ever go by the name of Rhonda Walker?<br>21  A. No.<br>22  Q. And when were you married approximately?<br>23  A. April 1992.<br>24  Q. And did that marriage end in divorce?<br>25  A. Yes. | 1   A. My father is deceased.<br>2   Q. Do you have any siblings?<br>3   A. Yes, I do.<br>4   Q. How many siblings do you have?<br>5   A. I have one sister and two brothers.<br>6   Q. Do they all reside in Alabama?<br>7   A. No.<br>8   Q. Which ones reside in Alabama?<br>9   A. My sister.<br>10  Q. What is her name?<br>11  A. Her name is Ann Rhodes. And my brother,<br>12 Jamie Rhodes.<br>13  Q. Now, are they both in the greater Montgomery<br>14 area?<br>15  A. No. They're in Ozark, Alabama.<br>16  Q. Do you have any aunts and uncles in Alabama?<br>17  A. Yes.<br>18  Q. All right. Whereabouts in Alabama?<br>19  A. In Ozark.<br>20  Q. Can you just give me the last names of your<br>21 aunts and uncles?<br>22  A. Yes, uh-huh. Last name of my uncle is<br>23 McNair. Last name of one of my aunts, her last name<br>24 is Johnson. And last name Robertson is an aunt.<br>25    MR. LEWIS: Let me interject here if I may, |
| **Page 11** | **Page 13** |
| 1   Q. What was the approximate date of the divorce?<br>2   A. August of 1996.<br>3   Q. And you mentioned you have two children, ages<br>4 11 and 15?<br>5   A. Yes.<br>6   Q. They're living with you and not the father?<br>7   A. Yes.<br>8   Q. Are they dependents? Do you claim them as<br>9 dependents?<br>10  A. Yes.<br>11  Q. Do you have any relatives over the age of 18<br>12 in Alabama?<br>13  A. Yes.<br>14  Q. How many? Let me rephrase that question. Do<br>15 you have any relatives over the age of 18 who reside<br>16 in the Montgomery area?<br>17  A. No.<br>18  Q. And how about your parents? Are they living<br>19 in Alabama?<br>20  A. Yes.<br>21  Q. Where do they reside?<br>22  A. My mother lives in Ozark, Alabama.<br>23  Q. What is her name?<br>24  A. Cathryn Patterson with a C.<br>25  Q. And how about your father? | 1 James.<br>2    MR. DUBOIS: Yeah.<br>3    MR. LEWIS: This is a non-jury trial.<br>4    MR. DUBOIS: I understand that.<br>5    MR. LEWIS: Okay.<br>6    MR. DUBOIS: Yeah.<br>7    MR. LEWIS: The way you're going, I assumed<br>8 -- okay.<br>9    MR. DUBOIS: No. I understand. I just do it<br>10 for witness purposes as well. Obviously, you do it<br>11 for jury purposes in a jury case.<br>12  Q. Now, of all those relatives, is the only one<br>13 you've talked to about this case is your mother?<br>14  A. Yes.<br>15  Q. All right. Where did you attend high school?<br>16  A. Carroll High School.<br>17  Q. Where is that located?<br>18  A. In Ozark, Alabama.<br>19  Q. All right. And did you graduate from high<br>20 school?<br>21  A. Yes.<br>22  Q. What year did you graduate?<br>23  A. 1988.<br>24  Q. All right. And do you have any education<br>25 beyond high school? |

FALICIA RHODES v. UNITED STATES OF AMERICA                                    3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

5 (Pages 14 to 17)

| Page 14 | Page 16 |
|---|---|
| 1   A.  Yes.<br>2   Q.  Tell me briefly about that education.<br>3   A.  Went to Troy State University in Troy.<br>4   Q.  And when did you go there?<br>5   A.  I went there in -- started the summer of 1988<br>6  and finished in 1991.<br>7   Q.  Any education beyond that?<br>8   A.  No.<br>9   Q.  Have you ever been in the military?<br>10  A.  No.<br>11  Q.  Now, I'm going to direct your attention<br>12  now --<br>13       MR. DUBOIS: Let me make this Exhibit #1.<br>14  Q.  I'm just going to briefly ask you about your<br>15  employment history. I think it'll help to have that.<br>16  I've handed you a document marked as Defendant's<br>17  Exhibit #1, and these are your responses to a set of<br>18  interrogatories I served upon your counsel. And have<br>19  you seen this documents before?<br>20  A.  Yes.<br>21  Q.  All right. And if you turn to page 4, that<br>22  is your signature on the last page?<br>23  A.  Yes.<br>24  Q.  And the day you signed it is February 1st?<br>25  A.  That's correct, yes. | 1  Rock, and I oversee all new accounts that come into<br>2  our business.<br>3   Q.  What are the -- is that an office job or --<br>4   A.  That's where I'm in the market seven hours a<br>5  day.<br>6   Q.  Do you have a certain territory you're<br>7  assigned to?<br>8   A.  I'm over 10 counties.<br>9   Q.  Montgomery one of them?<br>10  A.  Montgomery -- I go as far as north up to<br>11  Jemison area, go as far as Greenville and as far as<br>12  Auburn and all of Montgomery County.<br>13  Q.  And is this a Monday to Friday job or do you<br>14  usually work weekends as well?<br>15  A.  Monday through Friday.<br>16  Q.  What are the typical hours?<br>17  A.  My day starts around 6:45 and ends around<br>18  five in the afternoon.<br>19  Q.  How many miles do you think you cover a day<br>20  in driving?<br>21  A.  Anywhere from 40 to approximately about 70<br>22  miles.<br>23  Q.  And you're fully able to perform your job<br>24  physically?<br>25  A.  Yes. |

| Page 15 | Page 17 |
|---|---|
| 1   Q.  And when you supplied the information to<br>2  complete these, did you try to be as accurate as<br>3  possible?<br>4   A.  Yes.<br>5   Q.  Now, I want to turn to interrogatory number<br>6  three which had asked you about places you had worked<br>7  from January 1st, 2002 to the present. You see where<br>8  I'm talking about? It starts on the first page and<br>9  continues on to the second.<br>10  A.  Okay.<br>11  Q.  It indicates you currently work for a Buffalo<br>12  Rock Pepsi?<br>13  A.  Yes.<br>14  Q.  Do you still work there today?<br>15  A.  Yes.<br>16  Q.  And you started there on June 25th, 2004?<br>17  A.  Yes.<br>18  Q.  Key account coordinator was your job?<br>19  A.  Yes.<br>20  Q.  Is that still your job?<br>21  A.  Yes.<br>22  Q.  And what are the typical duties of a key<br>23  account coordinator?<br>24  A.  Key account coordinator is where I go out<br>25  into the market and drum up new business for Buffalo | 1   Q.  Who is your current supervisor?<br>2   A.  Jimmy Gracin.<br>3   Q.  Was he your supervisor back on January 27th,<br>4  2006?<br>5   A.  Yes.<br>6   Q.  And is the salary of $495 per week with<br>7  incentive pay still accurate?<br>8   A.  No.<br>9   Q.  How has that changed?<br>10  A.  We have -- since this we have received a<br>11  raise.<br>12  Q.  Do you know approximately what it is now per<br>13  week?<br>14  A.  510.<br>15  Q.  With the incentive pay?<br>16  A.  Yes.<br>17  Q.  Is the incentive pay based on sales?<br>18  A.  Yes, it is.<br>19  Q.  Now, do you have health insurance through<br>20  Buffalo Rock Pepsi?<br>21  A.  No.<br>22  Q.  Did you have health insurance through any of<br>23  your previous jobs?<br>24  A.  Yes.<br>25  Q.  What was the last job you had health |

FALICIA RHODES v. UNITED STATES OF AMERICA                                    3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

6  (Pages 18 to 21)

| Page 18 |
|---|
| 1  insurance with? |
| 2     A.  OSI. |
| 3     Q.  That's the job you held from December of 2003 |
| 4  through June of 2004? |
| 5     A.  Yes. |
| 6     Q.  What does OSI stand for? |
| 7     A.  It's an outsourcing company for BellSouth. |
| 8     Q.  And who was your -- do you know what I guess |
| 9  company supplied your insurance or what your insurance |
| 10  was? |
| 11     A.  No, I don't recall. |
| 12     Q.  So did you have any insurance coverage in |
| 13  January of 2006? |
| 14     A.  No. |
| 15     Q.  And let's see.  The other two jobs, is this |
| 16  information, when you review it today, still accurate |
| 17  for OSI and Price Busters? |
| 18     A.  Yes. |
| 19     Q.  Let's turn now to interrogatory number six, |
| 20  which is on page 3.  That's where I had asked you |
| 21  about previous healthcare providers you had seen in |
| 22  the past 10 years, and you mentioned a Dr. Griggs. |
| 23     A.  Yes. |
| 24     Q.  That's the doctor that performed your |
| 25  hysterectomy? |

| Page 20 |
|---|
| 1     A.  Dr. Beauchamp. |
| 2     Q.  And at this point, did Dr. Beauchamp -- did |
| 3  you see him for the first time after you fell at the |
| 4  post office or had you seen him before? |
| 5     A.  No.  I had seen him before. |
| 6     Q.  So Dr. Beauchamp is the doctor you've seen in |
| 7  the past 10 years? |
| 8     A.  Yes. |
| 9     Q.  When did you start going to Dr. Beauchamp? |
| 10     A.  When I moved here. |
| 11     Q.  And that would be approximately -- |
| 12     A.  June the 25th of '04. |
| 13     Q.  And what did you go to him for the first |
| 14  time? |
| 15     A.  Well, we needed a general doctor in this |
| 16  area.  He used to be in Ozark and he moved here so we |
| 17  just continued to see him here. |
| 18     Q.  And how many times do you think you've seen |
| 19  him -- well, let's say between when you first went to |
| 20  him in June of 2004 and when you went to see him after |
| 21  you fell at the post office? |
| 22     A.  Five times. |
| 23     Q.  Were any of those times for any headaches, |
| 24  back pain, neck pain? |
| 25     A.  Yes. |

| Page 19 |
|---|
| 1     A.  Yes. |
| 2     Q.  What type of doctor is Dr. Griggs? |
| 3     A.  He's an OBGYN. |
| 4     Q.  And I believe I saw somewhere this surgery |
| 5  was to treat a diagnosis of cancer? |
| 6     A.  Yes. |
| 7     Q.  And that was in July of 2005? |
| 8     A.  Yes. |
| 9     Q.  And did that surgery cure the cancer? |
| 10     A.  Yes. |
| 11     Q.  Have you had any complications from that |
| 12  surgery? |
| 13     A.  No. |
| 14     Q.  Any complications from the cancer? |
| 15     A.  No. |
| 16     Q.  Have you seen Dr. Griggs since July of 2005? |
| 17     A.  Yes. |
| 18     Q.  Just annual appointments? |
| 19     A.  Yes. |
| 20     Q.  Now, do you have any other doctors besides |
| 21  Dr. Griggs like a family doctor or a general practice |
| 22  doctor you've seen for any colds or illnesses or |
| 23  annuals? |
| 24     A.  Yes. |
| 25     Q.  Who are the other doctors you've seen? |

| Page 21 |
|---|
| 1     Q.  When was the first time you went to see |
| 2  Dr. Beauchamp for any headaches or muscular pain? |
| 3     A.  I don't recall that date. |
| 4     Q.  Do you recall what year maybe? |
| 5     A.  I don't recall. |
| 6     Q.  All right.  Now, besides Dr. Beauchamp, have |
| 7  you seen any other doctors in the Montgomery area in |
| 8  the past 10 years? |
| 9     A.  No. |
| 10     Q.  Ever been to a chiropractor? |
| 11     A.  No. |
| 12     Q.  How about to physical therapy? |
| 13     A.  Yes. |
| 14     Q.  Before the incident or before the time you |
| 15  went after you fell at the post office, had you been |
| 16  then? |
| 17     A.  No. |
| 18     Q.  Now, was there an incident approximately |
| 19  eight years ago where you ran into a Red Lobster sign |
| 20  and hurt your hip? |
| 21     A.  Yes. |
| 22     Q.  All right.  Can you tell me about that? |
| 23     A.  At the time, I worked for Collins Signs, and |
| 24  they do neon lighting for Red Lobster.  They make the |
| 25  Red Lobster signs, Home Depot signs.  And there was |

FALICIA RHODES v. UNITED STATES OF AMERICA                                        3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

7 (Pages 22 to 25)

Page 22

1  one on the corner of the table; and I come by, and the
2  lobster tail stuck me in the right side.
3      Q.  Is this when you were just eating at the
4  restaurant, you were walking by a table?
5      A.  No.  This was actually at Collins Signs where
6  we worked, where they make the signs.
7      Q.  Okay.  The sign was protruding out --
8      A.  Yes.
9      Q.  -- and you hit it!  All right.  And did you
10  seek any medical treatment?
11     A.  Yes.
12     Q.  What type of injury did you suffer from
13  hitting the sign?
14     A.  Just had bruising and soreness.
15     Q.  What kind of medical treatment did you seek?
16     A.  Just went to the local doctor that Collins
17  Signs used to make sure that nothing was injured.  He
18  had told me I just had bruised my inner thigh -- or
19  inner hip, I'm sorry.  And he just put ice on it and
20  gave me something for pain.
21     Q.  Did you file any kind of workers' comp type
22  claim?
23     A.  No.
24     Q.  Did you file any type of claim to get any
25  medical recovery for that injury?

Page 23

1      A.  No.
2      Q.  And did the injury go -- the pain go away
3  eventually?
4      A.  Yes.
5      Q.  And when, approximately, was that?  Do you
6  know the year?
7      A.  Approximately around the year of 1999.
8      Q.  Do you know what type of pain-killer you
9  took?
10     A.  No, I don't.
11     Q.  And you don't happen to know the name of the
12  doctor you saw?
13     A.  No.
14     Q.  Now, do you wear contact lenses?
15     A.  No.
16     Q.  When was the last time you've been to an eye
17  doctor?
18     A.  Two years ago.
19     Q.  Any problem with your vision that you're
20  aware of?
21     A.  No.
22     Q.  Let me direct your attention now to a
23  document marked as Defendant's Exhibit #2, which is a
24  copy of the complaint that was filed in this lawsuit.
25  If you can turn to page 4, is that your signature at

Page 24

1  the bottom of page 4?
2      A.  Yes.
3      Q.  And looks -- did you sign it on or about June
4  20th, 2006?
5      A.  Yes.
6      Q.  And before you signed it, did you read
7  through it to see if it was generally accurate in your
8  view?
9      A.  Yes.
10     Q.  And to your belief, looking through it today,
11  do you see anything that you believe is inaccurate or
12  that must be changed?
13     A.  No.
14     Q.  Now, the lawsuit you filed concerns your fall
15  at the Lagoon Park Post Office on January 27th, 2006,
16  correct?
17     A.  Yes.
18     Q.  And your claim -- I ask you to look at
19  paragraph seven -- that you slipped and fell on a
20  freshly waxed and still wet spot on the floor?
21     A.  Yes.
22     Q.  And on paragraph eight, there were no warning
23  signs or pylons or other devices that would have
24  warned you of the danger that you faced?
25     A.  There was none, no.

Page 25

1      Q.  And you injured your lower back and your hip
2  when you fell on the wet floor?
3      A.  Yes.
4      Q.  Now, I want to direct your attention back
5  to -- I guess it was a little bit over a year ago
6  today -- January 27th, 2006, the day of the fall.
7  What time did you arrive at the Lagoon Park Post
8  Office that day?
9      A.  Approximately 2:30, 2:40 -- between 2:30 and
10  2:45.
11     Q.  And what did you do between the time you woke
12  up that morning and you arrived at the Lagoon Park
13  Post Office?
14     A.  Took my children to school, went in to work,
15  did some work there; returned home, picked up my best
16  friend, and we ran some errands.
17     Q.  Did you take any medication that morning?
18     A.  No.
19     Q.  And the best friend you mentioned picking up
20  was Ms. Turner?
21     A.  Yes.
22     Q.  At the time, did she live in Montgomery,
23  Alabama?
24     A.  No.
25     Q.  Was she visiting you from out of town?

FALICIA RHODES v. UNITED STATES OF AMERICA                    3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

8 (Pages 26 to 29)

| Page 26 | Page 28 |
|---|---|

Page 26

1    A.  Yes.
2    Q.  How long was she visiting for?
3    A.  For the weekend.
4    Q.  So this was a Friday, January 27th.  When had
5  she arrived in town?
6    A.  She arrived Thursday night, that Thursday
7  night before.
8    Q.  The 26th?
9    A.  Yes.
10   Q.  And how long did she stay?
11   A.  Through Monday, that following Monday.
12   Q.  All right.  And you say you dropped off the
13  children at school.  Where is their school located?
14   A.  My daughter goes to school at Dozier
15  Elementary which is on the Eastern Bypass next to the
16  BMW dealership.
17   Q.  How about your son?
18   A.  My son goes to Dozier -- goes to Georgia
19  Washington Junior High School, which is located on
20  Pike Road.
21   Q.  Did you drop both of them off at school that
22  morning?
23   A.  No.
24   Q.  Just your daughter?
25   A.  Just my daughter.

Page 28

1    Q.  Was it raining?
2    A.  No.
3    Q.  And what type of car do you drive?
4    A.  '05 Impala.
5    Q.  And in terms of what you were wearing that
6  day, do you recall?
7    A.  Yes.
8    Q.  What kind of shoes were you wearing?
9    A.  Was wearing a brown suede, low heel dress
10  shoe.
11   Q.  Had you worn this pair of shoes before?
12   A.  Yes.
13   Q.  Approximately how long had you owned these
14  shoes?
15   A.  Two years.
16   Q.  How often did you wear them?
17   A.  Maybe twice a year.
18   Q.  And when was the last time you had worn them
19  before this particular occasion?
20   A.  Don't recall.
21   Q.  Had you ever tripped while wearing them?
22   A.  No.
23   Q.  What kind of soles did they have?
24   A.  Had a rubber sole.
25   Q.  Have you ever stubbed your toe or caught your

Page 27

1    Q.  Let's see.  And you went to work and then you
2  returned home and then you went and ran some errands?
3    A.  Yes.
4    Q.  Do you recall what errands you ran?
5    A.  We just paid utility bills.
6    Q.  Which utility bills?
7    A.  The power bill, the gas bill and the water
8  bill.
9    Q.  So this would be going to Alabama Power?
10   A.  Alabama Power, Alagasco and Water Works.
11   Q.  And who was driving the car?
12   A.  I was.
13   Q.  And did you go to all three of those
14  locations, Alabama Power, Alagasco and the water
15  company before going to the post office?
16   A.  Yes.
17   Q.  Any other errands you recall before going to
18  the post office?
19   A.  We went to Big Lots.  We just kind of shopped
20  around after paying bills.
21   Q.  Did you have any cold that morning?  Were you
22  feeling okay?
23   A.  I was feeling fine.
24   Q.  What was the weather like, do you recall?
25   A.  It was a pretty warm day.  It wasn't cold.

Page 29

1  toe on anything while wearing a rubber-soled boot or
2  shoe?
3    A.  I don't recall.
4    Q.  What type of shoes did you usually wear?
5  When you say you wear this type of shoe twice a year,
6  this particular pair of shoes, what type did you
7  generally wear?
8    A.  About a three to four-inch high heel shoe.
9    Q.  So this was a lower heel than usual?
10   A.  Yes.
11   Q.  Was the type of sole different than usual?
12   A.  Yes.
13   Q.  What are your usual shoes?  How would you
14  describe the sole of a usual shoe?
15   A.  Well, some are rubber, some are just kind of
16  slick at the bottom.
17   Q.  And this was rubber?
18   A.  This was a rubber shoe.
19   Q.  And what type of -- do you recall what kind
20  of pants -- were you wearing pants or a skirt?
21   A.  I was wearing a pair of pants.
22   Q.  Are these the type that have kind of a bell
23  bottom or flowing bottom or are they more straight
24  leg?
25   A.  They were straight leg.

Page 30

1    Q.  Have you ever tripped or gotten caught up in
2  the pants leg of your shoes?
3    A.  No.
4    Q.  Pants leg of your shoes?  Let's strike that
5  question.  I think you understood my question.  Have
6  you ever basically gotten your shoes caught up in your
7  pants legs before and tripped?
8    A.  No.
9    Q.  Have you ever slipped and fallen before
10 January 27th, 2006?
11   A.  No.
12   Q.  All right.  Now, why were you at the Lagoon
13 Park Post Office on that day?
14   A.  I have a post office box that I receive mail
15 at that particular post office.
16   Q.  Is this a personal box?
17   A.  Yes.
18   Q.  And how many times before January 27th, 2006
19 had you been to Lagoon Park Post Office?
20   A.  Every day.
21   Q.  Every day.  Okay.  Did you generally go the
22 same time of day?
23   A.  No.
24   Q.  Is there a general time you tried to go there
25 or is it just whenever you had a chance?

Page 31

1    A.  Whenever I got a chance.
2    Q.  And generally when you went to the post
3  office, did you do anything else other than walk to
4  your box and get your mail and leave?
5    A.  No, just go get mail and come back.
6    Q.  Usually just to check your P.O. box and --
7    A.  Yes.
8    Q.  Now, when you arrived on January 27th, did
9  your friend, Ms. Turner, stay in the car?
10   A.  Yes.
11   Q.  Did you leave the car running?
12   A.  Yes.
13   Q.  And where did you park?  Do you recall where
14 you parked in relation to the front door?
15   A.  I parked to the left of the front door.
16   Q.  Approximately how far from it?  Was it a
17 convenient close spot or was it further away?
18   A.  It was a convenient close by.
19   Q.  Did you often have someone accompany you when
20 you drove to the post office to check your P.O. box?
21   A.  No.
22   Q.  And what were you planning to do after you
23 left the post office?
24   A.  It was time to pick up my daughter from
25 school.

Page 32

1    Q.  And what time did her school get out?
2    A.  Three o'clock.
3    Q.  All right.  Let me direct your attention
4  to --
5       MR. DUBOIS:  We'll make that Defendant's
6  Exhibit #3.
7    Q.  I handed you a document, two-page document,
8  marked Defendant's Exhibit #3, which are some
9  photographs of the Lagoon Park Post Office that I want
10 to use as a reference point.  Before we get to that,
11 though, I want you to look at that.  And to your
12 recollection, ignoring all the writing on this, do
13 these pictures look like they accurately reflect the
14 layout of the Lagoon Park Post Office?
15   A.  Yes.
16   Q.  And looking at photo one -- I put numbers in
17 front of the photos.  Do you see photo one?
18   A.  Yes.
19   Q.  Does that, in your recollection, show two
20 black mats where the front door is; and, then, if you
21 look to the left, that's like kind of a view looking
22 towards the left as you enter?
23   A.  Yes.
24   Q.  And then two and three also kind of show that
25 view to the left of the front door as you go in the

Page 33

1  front door and look to your left or turn left?
2    A.  Yes.
3    Q.  And is your P.O. box back in that far corner
4  as you look at photo three?
5    A.  Yes.
6    Q.  Is it in that little slot by the windows in
7  the back corner?
8    A.  Yes.
9    Q.  All right.  And if I give you a red pen, can
10 you kind of mark approximately where your P.O. box is
11 on Exhibit #3, photo three?  Does that pen work?
12   A.  No.
13   Q.  Try that one.  And is your P.O. box number
14 211074?
15   A.  Yes.
16   Q.  Now, as you walk to your post office, if you
17 came in the front door -- if you look at photo three,
18 this one has a red table that you pass on your left.
19 Was that red table there that day?
20   A.  Yes.
21   Q.  And there is also a trash can it looks like?
22   A.  Yes.
23   Q.  And some kind of recycling bin which you can
24 see in photo two?
25   A.  Yes.

FALICIA RHODES v. UNITED STATES OF AMERICA                                3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

10 (Pages 34 to 37)

Page 34

1    Q.  Do you recall any other objects in that area
2  or on the floor when you walked in that day?
3    A.  No.
4    Q.  And the black mats were there that day?
5    A.  Yes.
6    Q.  So on January 27th, 2006, you came in the
7  front door with the black mats which is kind of seen
8  in photo one.  Did you notice anything differently --
9  anything different in the post office that day from
10  the previous times you'd been there?
11    A.  No.
12    Q.  Now, what did you do upon entering the post
13  office that day?
14    A.  When I came in the door, I went to the left
15  as I always do.  I already had my key ready to stick
16  into the post office -- into my box.  Before I got
17  right at the table, and that's when I slipped and
18  fell.
19    Q.  When you say right at the table, you're
20  referring to the red table that's in photograph three?
21    A.  Yes.
22    Q.  Can you -- I'll give you the pen again --
23  mark approximately where you fell?  All right.  So for
24  the record, the little line you put --
25    A.  Yes.

Page 35

1    Q.  -- in photograph three is approximately where
2  you fell?
3    A.  Yes.  Yes.
4    Q.  And when you came into the lobby, was there
5  anyone in there?
6    A.  Yes.
7    Q.  Do you recall who or how many people?
8    A.  It was two people.
9    Q.  Can you describe them?
10    A.  One was a -- a white Caucasian woman.  I
11  don't recall her age or around about age.  Another one
12  was a Caucasian man, probably around age 60.
13    Q.  And where was the woman standing
14  approximately?
15    A.  She was standing in between -- the space in
16  between on -- on the photo three, she was standing in
17  between the two post -- the two areas of post boxes.
18    Q.  So if you look at photo three, there is a --
19  looks like a little hallway that goes toward some more
20  post boxes kind of in that little hallway area?
21    A.  Yes.
22    Q.  Do you know where she was looking or what she
23  was doing?
24    A.  No.
25    Q.  How about the man?  Where was he standing?

Page 36

1    A.  He was to the right as you -- where you put
2  your outgoing mail into the slot.
3    Q.  So if you came in the front door, he wouldn't
4  be in any of the areas in this picture; he would be to
5  the right toward where the lobby of the post office
6  is?
7    A.  If you came into the post office, he would be
8  kind of toward to the right of the -- when you walk
9  into the front door.
10    Q.  Did you say anything to either of these two
11  individuals when you walked in or did they say
12  anything to you?
13    A.  The gentleman did.
14    Q.  What did he say?
15    A.  He came over and asked me was I okay.
16    Q.  How about before you fell?  When you first
17  walked in, was there any communication or --
18    A.  No.
19    Q.  I'll get to after you fell in a few minutes.
20  Did you see any postal service employees in the lobby?
21    A.  No.
22    Q.  All right.  Now, were you in a hurry when you
23  were going to your post office box?
24    A.  No.
25    Q.  Walking faster than normal?

Page 37

1    A.  No.
2    Q.  Slower than normal?
3    A.  No.
4    Q.  Just your regular pace?
5    A.  Yes.
6    Q.  What were you thinking about?
7    A.  Just getting my mail and going to pick up my
8  daughter.
9    Q.  Where were you looking?
10    A.  Looking toward my mail -- my post office box.
11    Q.  And you said you had already gotten the key
12  out and you had it in your hand for the post office
13  box?
14    A.  Yes.
15    Q.  Did you see anything on the floor?
16    A.  No, unh-unh.
17    Q.  And approximately how long between the time
18  you walked in the front door and the time you fell?
19    A.  I would say within 30 seconds of being in
20  there.
21    Q.  Turning to the fall itself, do you recall the
22  first feeling you had when you were falling?  Was it
23  one foot gave away first, or was it both feet at the
24  same time?
25    A.  I don't recall.

FALICIA RHODES v. UNITED STATES OF AMERICA                                    3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

11 (Pages 38 to 41)

Page 38

1    Q.  All right.  Were you able to reach out and
2  try to catch yourself on anything?
3    A.  I was trying to hold my balance.
4    Q.  And how did you hit the floor?  I mean what
5  body part hit first, do you recall?
6    A.  My hip.
7    Q.  Which hip?
8    A.  My left hip.
9    Q.  Did any other part of your body hit the
10  floor, your head, your hands, your feet?
11    A.  My elbow and my feet.
12    Q.  Would it be the left elbow?
13    A.  Yes.
14    Q.  Now, falling down, you didn't hit any -- you
15  didn't hit the red table or anything or the trash can?
16    A.  No.
17    Q.  Were you carrying anything when you fell --
18    A.  No.
19    Q.  -- besides your keys?
20    A.  Nothing but my keys.
21    Q.  All right.  You didn't have a purse or
22  anything?
23    A.  No.
24    Q.  Approximately how long were you on the floor?
25    A.  Approximately about five minutes.

Page 39

1    Q.  And you mentioned before that the gentleman
2  who was in the lobby came over to you?
3    A.  Yes.
4    Q.  Did he come over right away?
5    A.  Yes.
6    Q.  What happened at that point?
7    A.  Well, when he approached me, he said, I tried
8  to get there before you fell.  I watched you fall.
9  When he came over, he asked me was I okay; and I told
10  him that I felt some pain on the left side.  He
11  grabbed -- extended his hand out to help me to get
12  up.  He asked me could I get up.  And I told him yeah,
13  that I felt like I could, and he helped me get up.
14  And at that time I stood at the red table.
15    Q.  Leaning against it?
16    A.  Yes.
17    Q.  Did you say anything to him besides what you
18  just mentioned?
19    A.  No, he -- no, I did not.
20    Q.  What happened at that point after he helped
21  you up?
22    A.  He went inside to one of the postal clerks to
23  let her know that I had fell.
24    Q.  Did you ask him to do that?
25    A.  No.

Page 40

1    Q.  All right.  Did you have any further
2  conversations with him after he went to get a
3  postal --
4    A.  No.  After that he left.
5    Q.  So I guess you didn't get his name?
6    A.  No.
7    Q.  You haven't seen him since?
8    A.  No.
9    Q.  All right.  What do you believe caused you to
10  fall?
11    A.  The floor being slick.
12    Q.  And what made you think the floor was slick?
13    A.  Because when I looked down I had residue all
14  over my shoes; and as I was standing, I had a chance
15  to look, and that's when I saw that the floor had been
16  waxed and it was still wet.
17    Q.  All right.  When you got up, you said you had
18  some residue on your shoes?
19    A.  Yes.
20    Q.  Can you describe the residue?
21    A.  It was white.
22    Q.  What kind of --
23    A.  It's like powder, something like some powder.
24    Q.  Did it have any smell?
25    A.  No.

Page 41

1    Q.  Approximately how much was on your shoes?
2  Are we talking about a lot of residue, a little bit of
3  residue?
4    A.  From the -- from the top of my shoe to the
5  back heel of my shoe on the left-hand side of the
6  shoe.
7    Q.  Top of the shoe?  When you say top of the
8  shoe, saying like if you're looking at a shoe, just
9  down the back heel to the top of the shoe or from the
10  front of the shoe to the back?
11    A.  From the front of the shoe to the back along
12  the side.
13    Q.  Along the bottom sole or the side?
14    A.  On the side of the shoe.
15    Q.  Do you know which side?
16    A.  On my left side of the shoe.
17    Q.  Which would be the outer side of the shoe or
18  the inner side?
19    A.  The outer side of the shoe on the left shoe.
20    Q.  Was it on the bottom sole of the shoe or just
21  the side?
22    A.  It covered the whole entire side of the shoe.
23    Q.  And had you looked at your shoes -- when was
24  the last time you looked at your shoes before you
25  walked in the post office?

FALICIA RHODES v. UNITED STATES OF AMERICA                                    3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

12 (Pages 42 to 45)

Page 42

1    A.  I don't recall.
2    Q.  Was there anything on your right shoe?
3    A.  No.
4    Q.  Did you at some point clean that substance
5  off your shoe?
6    A.  Yes.
7    Q.  When did you do that?
8    A.  I took them to the shoe shop probably about a
9  week later.
10   Q.  Ever take any pictures of what was on the
11 shoe?
12   A.  No.
13   Q.  All right.  And you say you also looked at
14 the floor and it was still wet?
15   A.  Yes.
16   Q.  All right.  And what led you to the
17 conclusion it was still wet?
18   A.  Because I saw water as well as wax.
19   Q.  Now, is this something you saw -- was it in
20 one spot on the floor or was it the entire floor?
21   A.  It was in one area of the floor.
22   Q.  All right.  So you stood up and you looked --
23 looking at picture three, were you looking towards the
24 windows in picture three at the floor?
25   A.  Yes.

Page 43

1    Q.  What area of the floor was wet again?
2    A.  Do I need to point --
3    Q.  Let me give you a pen if you'll just kind of
4  approximately.
5    A.  It was approximately this area of the floor,
6  around in that area.
7    Q.  And just for the record, you put a little --
8  just kind of colored in the area --
9    A.  Yeah.
10   Q.  -- on photo three that you recall being wet?
11   A.  Yes.
12   Q.  And was there a distinct line where the wet
13 ended and the rest of the floor began?  How could you
14 tell what was wet and what wasn't?
15   A.  Well, there was a puddle of some water just
16 in one spot.
17   Q.  So it was kind of a puddle?
18   A.  Yes, uh-huh.
19   Q.  That collected in the spot that you kind of
20 colored in in photo three on Exhibit #3?
21   A.  Yes.
22   Q.  Now, when you stood up, were your clothes
23 wet?
24   A.  No.
25   Q.  Did you run your hand through the puddle or

Page 44

1  did you feel the puddle at all to see what it felt
2  like?
3    A.  No.
4    Q.  So you don't know if it was hot or cold, the
5  consistency of it?
6    A.  No.
7    Q.  Did you smell anything?
8    A.  No.
9    Q.  Were your shoes wet?
10   A.  From the -- from the residue, yes.  From the
11 wax and --
12   Q.  Well, the white stuff on the side of your
13 shoe, you assume that was wax?
14   A.  I -- what -- I -- yes, I did.  I --
15   Q.  What made you think that the white stuff on
16 your shoe was wax?
17   A.  Because the floor had been waxed.
18   Q.  And what makes you think the floor had been
19 waxed?
20   A.  Well, the -- I don't recall.  I don't.
21   Q.  I'm just trying to understand what --
22   A.  Yeah, I know.
23   Q.  I mean, you say you stood up, you see I guess
24 a puddle of water and the white substance on the outer
25 sole of your left shoe?

Page 45

1    A.  Uh-huh.
2    Q.  Other than those two things, is there
3  anything else that made you think that there had been
4  wax on the floor?
5    A.  No.
6    Q.  Now, you didn't see anyone at the post office
7  putting wax on the floor or waxing the floor at any
8  point in time when you came in, did you?
9    A.  No.
10   Q.  Didn't see any buckets, wax bottles laying
11 around, mops, brooms?
12   A.  No.
13   Q.  Do you have any idea how long that substance
14 had been on the floor?
15   A.  No.
16   Q.  And you don't have any evidence that anyone
17 else entering the post office fell down either before
18 or after you that day, do you?
19   A.  No.
20   Q.  Do you have any evidence that anyone at the
21 post office knew about any substance being on the
22 floor when you went in?
23   A.  No.
24   Q.  Now, at some point, did someone with the
25 postal service come out to you?

FALICIA RHODES v. UNITED STATES OF AMERICA                                    3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

13 (Pages 46 to 49)

Page 46

1     A.  Yes.
2     Q.  And did she introduce herself as Ms. Whorrell
3  or did she?
4     A.  Well, the first lady that come out was the
5  clerk that was behind the counter when the gentlemen
6  went in to tell her that I had fell.
7     Q.  Tell me what happened when the clerk came
8  out.
9     A.  She come out and she asked me was I okay.  I
10  told her no.  And she said, well, hold on.  Stand
11  right here and I'll go get a supervisor.
12    Q.  Is that the extent of the conversation?
13    A.  Yes.
14    Q.  Did she give you her name?
15    A.  Her name is Ms. Janette -- and it's two
16  Janettes.  I just know the description of her.  I
17  don't know her last name.
18    Q.  How would you describe her?
19    A.  She's a heavy-set black lady, wears glasses,
20  usually wears her hair curly or either back in a pony
21  tail.
22    Q.  I guess you've seen her more than once going
23  to the post office?
24    A.  Yes.
25    Q.  Do you know her on a social basis?

Page 47

1     A.  No.
2     Q.  Have you ever talked to her besides this one
3  time?
4     A.  Other than just saying hello.
5     Q.  So she said hold on, let me get a supervisor.
6  How soon after she said that did a supervisor come
7  out?
8     A.  She come out right away.
9     Q.  And what happened when the supervisor came
10  out?
11    A.  She asked me what was -- what happened, and I
12  told her that I had fallen.  And then her and I both
13  took our feet -- I took my right foot and she took her
14  foot, and we kind of went over the area where the
15  floor was wet and had the residue on it.
16    Q.  And just -- before I get to that, you said
17  the floor was wet and it had the residue on it.  Did
18  you also see a residue on the floor?  Besides being on
19  your shoe, did you see the white substance on the
20  floor?
21    A.  No.  All I seen was on my shoe so.
22    Q.  So she came out.  Did she introduce herself
23  first?
24    A.  Yes, she did introduce herself.
25    Q.  Was that Ms. Whorrell?

Page 48

1     A.  Yes, it was.
2     Q.  Had you ever met or seen her before?
3     A.  No.
4     Q.  Ever met or seen her since?
5     A.  No.
6     Q.  All right.  So she asked you if you were
7  okay?
8     A.  Yes, she did.
9     Q.  What was your response?
10    A.  I told her that I was -- that my left side
11  was hurting, but I was more shooken up than anything.
12    Q.  All right.  And both of you, you said, slid
13  your right feet across the floor?
14    A.  I slid my right foot over the floor as well
15  as she slid her foot.
16    Q.  And what happened when you slid your feet
17  over the floor?
18    A.  I told her, I said, well, you -- I asked her
19  did she see what I saw, and she said yes.  And then
20  that's when in return she asked the custodian to put
21  up a sign.
22    Q.  So you recall sliding your foot over and
23  saying, Do you see what I see, and she said yes?
24    A.  Yes, uh-huh.
25    Q.  Was there any other discussion or

Page 49

1  conversation between the two of you?
2     A.  She took my name and address and phone
3  number.  She in return told me that if I had any more
4  problems that I could contact her.  Again, she asked
5  me was I okay.
6     Q.  And what did you say the second time?
7     A.  I told her the same thing I told her the
8  first time, that my side was hurting, but I was
9  shooken up.
10    Q.  Did you say that you had been afraid that you
11  might hit something as you fell, but luckily you had
12  not?
13    A.  Yes.
14    Q.  Did you tell her that, you know, I think I
15  just scared myself more than anything?
16    A.  Well, I told her I was shooken up more than
17  anything at that time, yes.
18    Q.  And I think you mentioned that you told her
19  your back or your hip were hurting?
20    A.  Yes, I had told her I was more -- at that
21  time I hurt -- felt the more pain in my hip.
22    Q.  Did you mention to Ms. Whorrell your
23  suspicion or belief that there had been wax on the
24  floor?
25    A.  I don't recall.

FALICIA RHODES v. UNITED STATES OF AMERICA                                    3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

14 (Pages 50 to 53)

Page 50

1    Q.  Now, you said Ms. Whorrell got a custodian to
2  come out?
3    A.  Yes, she did.
4    Q.  Did the custodian come out while you were
5  still there?
6    A.  Yes.
7    Q.  Did you talk to him at all?
8    A.  No.
9    Q.  And what did the custodian do when he came
10  out?
11    A.  He had a wet floor sign and he put it out.
12    Q.  Did they do anything else?
13    A.  Not that I recall.
14    Q.  Did he have any conversation with
15  Ms. Whorrell in your presence?
16    A.  Did he?
17    Q.  Yeah.  Did you see any conversation between
18  the two of them, hear anything they discussed?
19    A.  I don't recall.
20    Q.  The custodian didn't say anything to you?
21    A.  I don't recall.
22    Q.  All right.  Besides talking to Ms. Whorrell
23  after you had fallen and the clerk who came out when
24  you first fell, did you talk to anyone else at the
25  post office?

Page 51

1    A.  Not at that particular post office, no.
2    Q.  Now, you mentioned that Ms. Whorrell got your
3  contact information, and I guess she gave you her
4  contact information?
5    A.  Yes.
6    Q.  And said to call if there were any problems?
7    A.  Yes.
8    Q.  And at that point after you exchanged that
9  information, what happened next?
10    A.  I got myself together and I walked to the
11  car.  I let my best friend know that I had just fallen
12  in the post office.  I asked her would she drive.  She
13  got out of the passenger seat and got into the
14  driver's seat.
15    Q.  Did you -- oh.
16    A.  She --
17    Q.  Were you able to get your mail before you
18  left or did you leave it at the post office?
19    A.  No.
20    Q.  You just left there --
21    A.  I just left.
22    Q.  -- straightaway?  Were you able to walk to
23  walk to your car with no problem?  No one had to assist you to
24  walk to your car?
25    A.  No one had to assist me, no.

Page 52

1    Q.  So you got to the car, you told her you had
2  just fallen.  Did you tell her you thought you had
3  fallen on wax?
4    A.  I don't recall the conversation.
5    Q.  But then you had her switch and she drove?
6    A.  Yes.
7    Q.  Where did you go at that point?
8    A.  At that point it had -- it was right at three
9  o'clock.  We went to pick up my daughter.
10    Q.  Approximately what time did you reach the
11  school to pick up your daughter?  Were you late?
12    A.  About five minutes after three.
13    Q.  And during the time driving to pick up your
14  daughter, did you have any more conversation with
15  Ms. Turner about your fall?
16    A.  Yes.
17    Q.  Do you recall that conversation?
18    A.  I told her exactly what had happened in the
19  post office.  And I told her at that time my neck and
20  head started hurting.  And she asked me did I want her
21  to take me to the doctor -- to the hospital, and I
22  told her yeah -- yes, but we needed to pick up my
23  daughter first because I didn't have anyone else to
24  pick her up.
25    Q.  Did you take any medication after the fall?

Page 53

1  Aspirin, Tylenol, ibuprofen or anything?
2    A.  No.
3    Q.  So you went and got your daughter?  What
4  happened at that point?
5    A.  When we got my -- when we picked up my
6  daughter, I in return called Ms. -- the lady from the
7  post office.  Sorry.  I don't remember her name.  I
8  called her to tell her that I was on my way to Baptist
9  East to the hospital; that at that point my neck and
10  back -- neck and head had started hurting.
11    Q.  Did you ask her if you needed a claim number
12  or something?
13    A.  No.  What she did, she in return gave me a
14  phone number to their home office in Birmingham and
15  for me to notify them, and I did so.
16    Q.  All right.  So when you called Ms. Whorrell,
17  the only thing she did was refer you to the Birmingham
18  office?
19    A.  She took down that I -- she took down the
20  information that I told her, I was on my way to
21  Baptist East to the hospital.  And she said, well, let
22  me give you this number to the home office in
23  Birmingham.
24    Q.  Anything else discussed on that phone call?
25    A.  She said that I needed to contact the home

FALICIA RHODES v. UNITED STATES OF AMERICA                                    3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

Page 54

1 office and they would handle it from there.
2     Q. Pretty short phone call, then?
3     A. It wasn't -- yeah, it was pretty short. Yes.
4     Q. Were you calling from home or from a cell
5 phone?
6     A. I called from a cell phone.
7     Q. In your car on the way?
8     A. Yes, uh-huh.
9     Q. Do you know approximately what time you made
10 that phone call?
11     A. Got my daughter at 3:05 -- well, we were
12 there at 3:05, takes a minute for them to come out. I
13 would say around 3:30.
14     Q. All right. If Ms. Whorrell thought the phone
15 call was about 4:20, does that sound accurate to you?
16 Do you think it was earlier than that?
17     A. It was earlier than that.
18     Q. So it was before you went home, your daughter
19 was still in the car? Between the school and going to
20 your home is when you made the call to the post
21 office?
22     A. Yes.
23     Q. All right. And then you say you got contact
24 information for someone in Birmingham with the post
25 office?

Page 55

1     A. Yes.
2     Q. Did you call that person?
3     A. Yes, I did.
4     Q. All right. And do you know who you talked
5 to?
6     A. I don't recall the gentleman's name that I
7 talked to.
8     Q. Could it have been a Paul Denham? Does that
9 sound familiar at all?
10     A. Denham, yes, that's correct.
11     Q. And what do you recall from the conversation
12 with him?
13     A. I explained to him what had happened. I told
14 him that I was on my way to Baptist East.
15     Q. When you say you described what happened?
16     A. I explained to him what had happened about
17 the fall in the post Office and who I spoke to.
18     Q. Did you mention at that time you thought you
19 had slipped on wax, or did you just say I was going to
20 my post office box and I fell?
21     A. I don't recall.
22     Q. And you told him you were going to the
23 hospital?
24     A. Yes.
25     Q. What else was said?

Page 56

1     A. He asked me my address. I gave him the
2 address, all the information that he needed, and he
3 said that I would be receiving some paperwork in the
4 mail, and that if I had any more problems or any more
5 questions, just to give him a call.
6     Q. Do you recall anything else in that
7 conversation?
8     A. No, I don't.
9     Q. So at any point in time, did you ask
10 Ms. Whorrell or Mr. Denham for a claims number or use
11 that terminology? Do I need a claims number? Can I
12 get a claims number?
13     A. I don't recall.
14     MR. DUBOIS: Let's take a short break.
15     MR. LEWIS: Sure.
16         (Brief recess)
17     Q. All right. Before we took a break, I think
18 we were talking that you had just made a phone call to
19 the post office, and you were about to go to Baptist
20 East?
21     A. Yes.
22     Q. Did you drop off your daughter at home before
23 you went to Baptist East?
24     A. No.
25     Q. She went with you to Baptist East?

Page 57

1     A. Yes.
2     Q. As well as your friend, Ms. Turner?
3     A. Yes.
4     Q. Do you recall what time approximately you
5 arrived there?
6     A. I don't recall the approximate time.
7     Q. Now, do you have an Aunt Lorene Lowe?
8     A. Yes.
9     Q. Was she with you on that day?
10     A. No.
11     Q. Did you just supply her name as just a
12 relative on the admissions form?
13     A. Yes, uh-huh.
14     Q. Closest living relative, that type of thing?
15     A. Yes.
16     Q. And it says arrival mode, family driven. Did
17 you tell them it was a family member driving you?
18     A. No. I don't even recall them asking me that
19 question.
20     Q. Ms. Turner was driving, though?
21     A. Yes, uh-huh.
22     Q. All right. And what happened when you
23 arrived at the emergency room?
24     A. Checked in as normal. They asked me what was
25 my nature of why I was there. I told them what had

FALICIA RHODES v. UNITED STATES OF AMERICA                           3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

16 (Pages 58 to 61)

| Page 58 | Page 60 |
|---|---|

**Page 58**

1  happened. I took a number, filled out some paperwork
2  and had a seat until they called my name.
3      Q.  Approximately how long did you have to wait?
4      A.  About 30 minutes.
5      Q.  Then you were seen by a doctor?
6      A.  Yes.
7      Q.  Do you recall the name of the doctor?
8      A.  No, I don't.
9      Q.  All right.  And what did you tell the doctor
10 about your symptoms?
11     A.  I told him about the fall at the post office,
12 told him where I was hurting.  I showed him exactly
13 where I was hurting.
14     Q.  All right.  And can you tell me what did you
15 tell him was hurting and what did you show him?
16     A.  I told him that when I fell that I fell to
17 the left of me, all of my weight shifted to the left
18 and that I hit my hip, lower back and my neck was
19 hurting and that was causing my head to hurt.
20     Q.  How did he treat your symptoms?
21     A.  Well, he ordered x-rays to make sure that
22 nothing was broken.
23     Q.  And x-rays showed nothing was broken, right?
24     A.  It actually showed nothing was broken.
25     Q.  What did he do other than x-rays?

**Page 59**

1      A.  I don't recall everything that he done.  He
2  did touch the spots where I was showing him to -- I
3  guess to see how much pressure and severe pain that I
4  was having.
5      Q.  Did you describe the pain as severe?
6      A.  Yes, I did.
7      Q.  Any idea why they would check severity of
8  pain mild on the hospital forms?
9      A.  No, I don't know why.
10     Q.  Do you recall getting a -- I guess some pain
11 medication, Toradol, at the hospital?
12     A.  Yes, I do.
13     Q.  And then I guess after, they came back and
14 probably told you that the x-rays were negative and
15 discharged you?
16     A.  Yes.
17         MR. DUBOIS:  Mark this as Exhibit #4.
18     Q.  I represent to you these are some Baptist
19 Health medical records that were produced by your
20 attorney in this case.  And I want to direct you
21 actually to the last page which is patient copy of
22 some discharge instructions.  Do you recall seeing
23 this page before?
24     A.  Yes.
25     Q.  Is that your signature, Falicia Rhodes, at

**Page 60**

1  the bottom left kind of in the middle?
2      A.  Yes.
3      Q.  And it looks like a discharge time of 20:30?
4      A.  Yes.
5      Q.  All right.  Do you recall a -- do you recall
6  receiving this form?
7      A.  Yes, I do.
8      Q.  It indicates you were prescribed -- it's
9  tough to read, but Naproxen?
10     A.  Yes.
11     Q.  500 milligrams.  Did they give you samples or
12 give you a prescription to get filled?
13     A.  They gave me a prescription.
14     Q.  And it also indicates you should use a cold
15 compress 24 hours to affected area and then a warm
16 compress?
17     A.  Yes.
18     Q.  Did they explain what they meant by that?
19     A.  I don't recall.
20     Q.  Now, did you follow these instructions and
21 use a cold compress followed by a warm compress?
22     A.  Yes, I did.
23     Q.  For how long?
24     A.  The entire weekend.
25     Q.  Did it help?

**Page 61**

1      A.  Somewhat, yes.
2      Q.  It looks like they referred you to a primary
3  care doctor?
4      A.  Yes.
5      Q.  Were you able to leave the hospital on your
6  own power?  I mean were you able to walk to your car?
7      A.  Yes.
8      Q.  All right.  And then it looks like subsequent
9  to that, you went to see your regular physician,
10 Dr. Beauchamp?
11     A.  Yes.
12     Q.  And I have that you saw him about February
13 2nd, 2006; is that right?
14     A.  Yes.
15         MR. DUBOIS:  Mark this as Exhibit #5.
16     Q.  I'm going to hand you a document now marked
17 as Defendant's Exhibit #5, and this is CVS Pharmacy
18 records that were produced by your attorney in this
19 case.  And I want to direct you to the first page.
20 There's a Naproxen label; do you see that?
21     A.  Yes.
22     Q.  Did you go and pick up the Naproxen after you
23 left the emergency room?
24     A.  Yes.
25     Q.  All right.  And this is a xerox copy, I

FALICIA RHODES v. UNITED STATES OF AMERICA                              3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

17 (Pages 62 to 65)

Page 62

1  guess, of the prescription information sheet that was
2  provided to you by the pharmacy?
3      A.  Yes.
4      Q.  And it looks like you paid 11.49 for it?
5      A.  Yes.
6      Q.  Now, do you have the receipt for that?  I'm
7  just asking because if you go to the last page, you
8  have two receipts there.  I didn't see the receipt for
9  the Naproxen.
10     A.  No, I don't.
11     Q.  And the instructions are to take one tablet
12  twice a day with meals; is that right?
13     A.  Yes.
14     Q.  Did you take the entire prescription?
15     A.  Yes, I did.
16     Q.  With meals?
17     A.  Yes.
18     Q.  Did it help?
19     A.  It helped somewhat.
20     Q.  When you went to see Dr. Beauchamp, what did
21  you tell him your symptoms were?
22     A.  I told him that I was still having some --
23  some hip pain, my lower back and my neck, and was
24  having headaches.
25     Q.  Now, besides taking this Naproxen and using

Page 63

1  the cold and warm compress before going to see
2  Dr. Beauchamp, did you take any other medication?
3      A.  No.
4      Q.  No over-the-counter Tylenol or anything?
5      A.  No.
6      Q.  Did you take off any time from work between
7  the 27th and going to see Dr. Beauchamp?
8      A.  No -- no.
9      Q.  Have you ever had headaches before this --
10  before you fell on January 27th, 2006?
11     A.  Just normal headaches.
12     Q.  And what did you usually take to treat them?
13     A.  Tylenol.
14     Q.  Did Tylenol generally help?
15     A.  Yes.
16     Q.  How often would you have headaches?
17     A.  I don't recall.
18     Q.  How about back or hip pain?  Ever have back
19  or hip pain before you went to see -- before the fall
20  on January 26th?
21     A.  No.
22     Q.  How did Dr. Beauchamp treat you upon that
23  first visit if you recall?
24     A.  After telling him what the problem was, he
25  just touched the areas to see the severity of the pain

Page 64

1  and then in return gave me a prescription, told me to
2  try that.  If that did not work, then we would go to
3  the next step.
4      Q.  And was that prescription for hydrocodone?
5      A.  Yes.
6      Q.  Did he explain what the next step would be?
7      A.  He told me that if it did not work that he
8  would send me to therapy.
9      Q.  Did you set up a follow-up appointment at
10  that time with him?
11     A.  Yes, I did.
12     Q.  Let's go back to Defendant's Exhibit #5.
13         MR. DUBOIS:  Did I give you a copy?
14         MR. LEWIS:  Uh-huh.
15     Q.  Hydrocodone is on the second page, correct?
16     A.  Yes.
17     Q.  And did you go pick that up from the CVS
18  pharmacy it looks like on February 5th, 2006?
19     A.  Yes.
20     Q.  And it says take one tablet every six hours
21  as needed?
22     A.  Yes.
23     Q.  Did you take one tablet every six hours until
24  the prescription had run out?
25     A.  Yes, I did.

Page 65

1      Q.  And did that help at all?
2      A.  It helped somewhat.
3      Q.  Did you ever receive a refill of the
4  Naproxen, the one -- the prescription you had received
5  from the emergency room or just that one?
6      A.  Just that one.
7      Q.  Now, at some point, did Dr. Beauchamp
8  prescribe Darvocet?
9      A.  Yes, he did.
10     Q.  Was that at that first visit or a subsequent
11  visit?  Do you know?
12     A.  I don't recall which visit it was.
13     Q.  Do you know if you were taking the
14  Hydrocodone at the same time you were taking the
15  Darvocet?
16     A.  No.
17     Q.  And I'm just looking at it.  If you look at
18  Defendant's Exhibit #5, the left of the first page,
19  there is Propoxy, which is the Darvocet.  That's the
20  CVS information sheet.  You see that there?
21     A.  Uh-huh.
22     Q.  There is a date of 2/6/06 on that page.  And
23  then if you go to the last page, there are some
24  receipts you supplied; and the one on the right on the
25  last page is for 22.79, which matches the price of the

FALICIA RHODES v. UNITED STATES OF AMERICA                                    3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

18 (Pages 66 to 69)

| Page 66 | Page 68 |
|---|---|
| 1  Propoxy on the first page, 22.79. And that receipt is<br>2  dated February 18th, 2006. Do you see that?<br>3     A.  Say the question again.<br>4     Q.  Well, I'm just trying to figure out when you<br>5  picked up the Darvocet. It looks like you picked it<br>6  up on February 18th, 2006, the date of the receipt.<br>7  Is that accurate? The last page?<br>8     A.  Okay. I don't recall when I got these<br>9  prescriptions.<br>10    Q.  Well, would it be fair to say the date on the<br>11  receipt indicating the payment would have been when<br>12  you picked them up from the pharmacy?<br>13    A.  Yes, uh-huh.<br>14    Q.  And when you got the Darvocet prescription,<br>15  did you take the pills?<br>16    A.  Yes.<br>17    Q.  Did you take the entire prescription?<br>18    A.  Yes.<br>19    Q.  Did it help?<br>20    A.  It helped somewhat.<br>21    Q.  All right. Now, the follow-up visit with<br>22  Dr. Beauchamp on Thursday, February 9th, 2006, does<br>23  that sound right?<br>24    A.  Yes.<br>25    Q.  And at that visit, do you recall what you | 1     A.  I don't recall the time.<br>2     Q.  Where did you apply the cold or the heat? I<br>3  mean, was it your hip, your neck?<br>4     A.  I did all three, all three places that I was<br>5  in pain.<br>6     Q.  How many times a day would you do that?<br>7     A.  Three times.<br>8     Q.  You don't recall approximately how long?<br>9     A.  No, I don't.<br>10    Q.  And he instructed you to rest. Did you at<br>11  any point take off any time from work at that point?<br>12    A.  Yes, I did.<br>13        MR. DUBOIS:  Make that as Defendant's Exhibit<br>14  #6.<br>15    Q.  I just handed you a document marked as<br>16  Defendant's Exhibit #6. Do you recognize this<br>17  document?<br>18    A.  Yes, I do.<br>19    Q.  Is this a doctor's note that you got from<br>20  Dr. Beauchamp on February 9th, 2006?<br>21    A.  Yes, I did.<br>22    Q.  And it says please allow Ms. Rhodes off until<br>23  2/12/06?<br>24    A.  That's correct, yes.<br>25    Q.  What, if anything, did you do with this note? |
| **Page 67** | **Page 69** |
| 1  told him about your symptoms?<br>2     A.  I told him that I -- he asked me was I still<br>3  having some pain. I told him yes, I was.<br>4     Q.  Did you tell him that using a body pillow had<br>5  helped?<br>6     A.  Yes, I told him that it did help to a degree.<br>7     Q.  Is that something he had suggested at the<br>8  previous appointment?<br>9     A.  I don't recall.<br>10    Q.  What kind of treatment was discussed at that<br>11  follow-up meeting on February 9th?<br>12    A.  Going to physical therapy.<br>13    Q.  Do you recall him instructing you to treat<br>14  your neck and left hip pain with ice versus heat, rest<br>15  and Darvocet?<br>16    A.  Yes.<br>17    Q.  Now, did you follow instructions with the ice<br>18  versus heat treatment?<br>19    A.  Yes, I did.<br>20    Q.  What did you do to carry out those<br>21  instructions?<br>22    A.  I did exactly what he asked me to do, what he<br>23  told me to do.<br>24    Q.  How long would you keep the cold on as<br>25  opposed to the warm? | 1     A.  I took it to my -- to my employer.<br>2     Q.  And how many days did you take off work?<br>3     A.  From the 9th through the 12th.<br>4     Q.  The 9th is a Thursday and the 10th is a<br>5  Friday; 11th is Saturday and 12th is Sunday. So did<br>6  you take off the Thursday and Friday?<br>7     A.  Yes.<br>8     Q.  And did you return to work on Monday, the<br>9  13th?<br>10    A.  Yes, I did.<br>11    Q.  At what point did you supply the note to your<br>12  employer? Is it when you returned to work on the<br>13  13th?<br>14    A.  No. I took it to them as soon as I finished<br>15  with Dr. Beauchamp on the 9th.<br>16    Q.  Did you take sick leave then on Friday, the<br>17  10th? You know, there's sick leave, leave without<br>18  pay. What type of leave was it, do you know?<br>19    A.  It was leave without pay.<br>20    Q.  Leave without pay. So you weren't --<br>21    A.  I was docked those hours, that time.<br>22    Q.  And what did you do during those three days<br>23  when you were on rest?<br>24    A.  I stayed in bed, rest, and did exactly what<br>25  he said about the warm and cold compresses. |

FALICIA RHODES v. UNITED STATES OF AMERICA                                              3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

19 (Pages 70 to 73)

Page 70

1    Q. Did you go run any errands or do anything?
2    A. No.
3    Q. Who took care of you during that time, if
4  anyone?
5    A. No one at that time, no.
6    Q. Did it help to spend some time resting? Did
7  the pain lessen at all?
8    A. It helped.
9    Q. Do you recall going back to see Dr. Beauchamp
10  on February 16th, 2006?
11    A. Yes, I do.
12    Q. And do you recall what you discussed at that
13  appointment?
14    A. I told him that I was still having some
15  pain. He had asked me was I doing exactly what he
16  asked me to do, the instructions, and I told him yes.
17  But I could not get rid of the headache. Mainly was
18  the headache, and I told him that my lower back was
19  still bothering me.
20    Q. Did you tell him Tylenol was offering little
21  relief for the headaches?
22    A. Yes, I did.
23    Q. At what point did you start taking the
24  Tylenol?
25    A. Well, after the Darvocet was gone -- after

Page 71

1  my prescriptions was gone, yes, I did take some
2  Tylenol?
3    Q. How much Tylenol did you take?
4    A. I don't recall.
5    Q. Did Tylenol help at all or was it --
6    A. It kind of eased the pain a little bit. It
7  didn't go completely away.
8    Q. How would you describe these headaches? I
9  mean what part of your head was hurting? Is there
10  a --
11    A. The -- this -- both sides in the back of my
12  head felt like somebody was screwing screws.
13    Q. And at that February 16th appointment, did
14  Dr. Beauchamp suggest some physical therapy?
15    A. Yes, he did.
16    Q. Did he tell you to still use the ice versus
17  heat treatment?
18    A. I don't recall him saying that.
19    Q. Do you recall continuing to do that?
20    A. I don't recall.
21    Q. And February 22nd, 2006, I believe you went
22  to physical therapy, real going shortly after that
23  appointment Dr. Beauchamp, going to physical therapy?
24    A. Yes.
25    Q. And that was at a place called Innerfit

Page 72

1  Physical Therapy?
2    A. Yes.
3    Q. Did you make that appointment or
4  Dr. Beauchamp's office made it?
5    A. Dr. Beauchamp's office made it.
6    Q. And what was the name of the physical
7  therapist that you dealt with there?
8    A. Ryan was -- it was either Ryan or Brian. I
9  want to say Ryan.
10    Q. Ryan Boyatt?
11    A. Yes, uh-huh.
12    Q. Is he the only one you dealt with in your
13  appointments?
14    A. No. I dealt with the physician or physical
15  therapy that ran the facility.
16    Q. Do you know the name of that person?
17    A. I don't recall her name. I just know what
18  she looks like.
19    Q. Who was the one who gave you your therapy
20  each time?
21    A. Ryan.
22    Q. Was it Ryan?
23    A. Uh-huh.
24    Q. And at the first meeting on February 22nd, do
25  you recall working out some kind of plan of care with

Page 73

1  the therapist?
2    A. Yes, uh-huh.
3    Q. And that called for essentially four visits
4  over two weeks where you get treatment?
5    A. Yes.
6    Q. And you had your first visit on the 22nd?
7    A. Yes.
8    Q. Tell me basically what that treatment
9  consisted of.
10    A. Well, the young lady that saw me first to
11  evaluate me, she made me lie flat down on my stomach
12  and she checked my -- my lower back, my neck. I
13  showed her where the pain was. Then she in turn kind
14  of measured me, and she told me that my body had
15  been -- had become offline and that one of my legs
16  needed -- kind of -- she kind of pulled my right leg a
17  little bit. It was like I was off alignment type
18  deal.
19    Q. Your legs were quite -- not quite --
20    A. Yeah, not quite where they should be, I
21  guess. And she did some things with my head to try to
22  ease the pain.
23    Q. Did she say what had caused this misalignment
24  in your legs?
25    A. Well, I don't recall the whole entire

FALICIA RHODES v. UNITED STATES OF AMERICA                                    3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

20 (Pages 74 to 77)

Page 74

1  conversation that we had about --
2      Q.  Do you know if this is something you've
3  always had like a differential leg length or something
4  like that or if it was from --
5      A.  No, I had never had any problems before.
6      Q.  No one had brought that to your attention?
7      A.  No.
8      Q.  Do you know how long the physical therapy
9  lasted on February 22nd?
10     A.  I was there approximately around maybe three
11 hours.
12     Q.  And the treatment helped?
13     A.  It -- it helped a little.  It was starting to
14 help.
15     Q.  Do you recall going back to your second
16 physical therapy treatment on February 24th, 2006?
17     A.  Yes.
18     Q.  And were you taking any medication in the
19 interim between those two visits?
20     A.  Other than Tylenol, no.
21     Q.  All right.  Do you recall telling your
22 physical therapist, I feel much better.  The pain is
23 about a 4 out of 10 now?
24     A.  Yes.
25     Q.  And you mentioned you were still having

Page 75

1  headaches?
2      A.  Yes.
3      Q.  Do you recall anything else that was
4  discussed when you went to your February 24th, 2006
5  physical therapy meeting?
6      A.  No.
7      Q.  And then again, you had the same physical
8  therapy treatment that you had received at the first
9  meeting or was it different?
10     A.  It was a little different.
11     Q.  What did it basically consist of again?
12     A.  Well, they were having me do different type
13 of exercises.
14     Q.  How long did you receive the treatment?
15     A.  On that day, three hours.
16     Q.  And did it seem to help?
17     A.  Somewhat.
18     Q.  Do you recall going back again for physical
19 therapy a few days later, February 28th, 2006, for
20 another session?
21     A.  Yes.
22     Q.  All right.  And at that session, did you tell
23 them -- let's see:  My left side of low back doesn't
24 hurt as bad.  It's a 3 out of 10 now, and I haven't
25 had a headache since the last visit?

Page 76

1      A.  Yes.
2      Q.  Do you recall discussing anything else at
3  that physical therapy session?
4      A.  No.
5      Q.  And did you receive the same type of
6  treatment you had received previously?
7      A.  Yeah, same type of treatment with a little
8  bit different exercises.
9      Q.  Approximately how long were you there?
10     A.  Three hours.
11     Q.  And again, did that treatment help?
12     A.  Yes, it helped some.
13     Q.  And then I have your fourth and final visit
14 being on March 1st, 2006 for physical therapy.  Does
15 that sound correct?
16     A.  Yes.
17     Q.  All right.  And at that session, do you
18 recall telling the physical therapist, I feel good.
19 My back is a little sore but not -- no severe pain.  I
20 still have not had a headache since last week.
21     A.  Yes.
22     Q.  And at that session, do you recall discussing
23 anything else with the physical therapist?
24     A.  No.
25     Q.  And again, did you receive the same time of

Page 77

1  treatment?
2      A.  Yes, I did.
3      Q.  Approximately three hours worth?
4      A.  Yes.
5      Q.  All right.  And at that point, were you
6  discharged from physical therapy and instructed or
7  asked to go back to your doctor for a follow up?
8      A.  Yes.
9      Q.  Was there any discussion about what else you
10 should do in the future or what else you could do or
11 any instructions or -- from the physical therapist
12 when you were discharged?
13     A.  Yes.
14     Q.  What did they tell you?
15     A.  They had given me a -- a rubber -- piece of
16 rubber -- it's about this long -- to put -- to use as
17 exercise.  They told me to do some of the exercises
18 that I was doing in physical therapy so they provided
19 one of the instruments that you use to do one of them.
20     Q.  Is that like a little thin rubber strip that
21 you use --
22     A.  Yes, uh-huh.
23     Q.  -- to stretch?
24     A.  Yes.
25     Q.  Did they give you an instruction sheet on

FALICIA RHODES v. UNITED STATES OF AMERICA                              3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

21 (Pages 78 to 81)

Page 78

1   what you're supposed to do with it?
2       A.  Yes.
3       Q.  Do you still have a copy of that instruction
4   sheet?
5       A.  I don't recall where it is.
6       Q.  All right.  Did they tell you anything else
7   besides providing that rubber strip and an instruction
8   sheet and telling you essentially, I guess, to do it?
9       A.  Just some exercises, just to ex -- you know,
10  put -- to come up with a exercise regimen.
11      Q.  And did you follow that course of treatment?
12      A.  Yes, I did with the rubber strip.  I did.
13      Q.  For how long?
14      A.  For approximately another month and a half.
15      Q.  And did that help?
16      A.  It helped, yes.
17      Q.  All right.  You haven't been back to physical
18  therapy since March 1st, 2006, right?
19      A.  No.
20      Q.  And it looks like you returned to
21  Dr. Beauchamp on -- let's see -- March 2nd, 2006 for
22  a follow-up; do you recall that?
23      A.  Yes.
24      Q.  Do you recall what was discussed -- I'm
25  sorry.  Let's see.  I said March 22nd.  March 2nd,

Page 79

1   2006.  Shortly after your physical therapy ended, you
2   went back to Dr. Beauchamp, right?
3       A.  Yes, I did.
4       Q.  Do you recall what was discussed when you
5   went back to him?
6       A.  No, I don't recall.
7       Q.  Did he give you any treatment plans,
8   medicine?
9       A.  He just told me to do exactly what the
10  physical therapy had asked me to do.  We discussed
11  that.
12      Q.  Did you tell him the physical therapy had
13  helped?
14      A.  Yes, I did.
15      Q.  Did you tell him your headaches and neck pain
16  were much improved?
17      A.  Yes, I did.
18      Q.  Did you tell him you were still having any
19  pain?
20      A.  I told him I was having some pain sometime,
21  but it was not a constant pain, no.
22      Q.  And he did not give you any new prescriptions
23  or anything?
24      A.  No.
25      Q.  Looks like March 24th, 2006, you returned to

Page 80

1   Dr. Beauchamp, is that right?
2       A.  Yes.
3       Q.  Why did you return to him on that day?
4       A.  I don't recall.
5       Q.  Do you recall telling him your pain had
6   returned?
7       A.  I think I was having a headache and also was
8   having -- felt like some sinus was going on.
9       Q.  All right.  Do you know how that was treated?
10      A.  I don't recall.
11      Q.  So was it a sinus headache that you went back
12  to him for?
13      A.  No.  What had happened, I -- I did have a
14  headache.  The headaches were starting back.  I
15  went -- I made a -- made a call and asked him could he
16  see me, and he said yes.  And he had asked me had
17  anything changed with me, and I told him no.  And he
18  did an exam, and he told me, he said, well, the
19  headaches seem to have returned.  He did in return
20  check my nose for sinus and all that kind of stuff.
21  And he said, well, I don't see a sign, but it may be
22  some sinus that -- you know, coming on.  But I just
23  told him that my head was hurting.
24      Q.  Had you been taking Tylenol to try to help
25  with the headaches?

Page 81

1       A.  No, I hadn't took anything.
2       Q.  When had the headaches returned?
3       A.  I don't recall the actual date.
4       Q.  Now, between your -- when you last had seen
5   Dr. Beauchamp and this appointment, had you done any
6   traveling, done anything different in your life?
7       A.  No.
8       Q.  Anything strenuous, moved any objects?
9       A.  No.
10      Q.  All right.  Now, are you currently suffering
11  any -- let me go back.  Have you seen Dr. Beauchamp
12  since March 24th, 2006?
13      A.  Yes.
14      Q.  When was the last time you saw him?
15      A.  Back in November.
16      Q.  November 2006?
17      A.  Yes.
18      Q.  What did you see him for at that time?
19      A.  Had a headache and was coming down with a
20  cold.
21      Q.  Now, between your appointment with him on
22  March 24th and that November appointment, had your
23  headaches gone away?
24      A.  They were coming and going.
25      Q.  And how about your back and hip pain?

FALICIA RHODES v. UNITED STATES OF AMERICA                3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

22 (Pages 82 to 85)

Page 82

1    A.  Back, some.  Hip, no.
2    Q.  So when you went to him in November, were you
3  going for the cold?
4    A.  No.  I was going because I had had a
5  headache.
6    Q.  And how did he treat you there?
7    A.  If I -- I can't recall the actual treatment
8  that he gave me.
9    Q.  Other than that time in November, have you
10  seen him any other time?
11    A.  No.
12    Q.  Now, are you currently suffering any pain
13  that you attribute to your fall at the Lagoon Park
14  Post Office?
15    A.  My headaches.
16    Q.  Other than the headaches.
17    A.  Nothing else.
18    Q.  All right.  How often do you have these
19  headaches?
20    A.  Well if you count today, I've had a headache
21  for two weeks.
22    Q.  So you have a headache today?
23    A.  Yes, I do.
24    Q.  How would you describe the headache you have
25  today on a scale of 1 to 10 in terms of pain?

Page 83

1    A.  About a 6.
2    Q.  Have you taken any medication for it?
3    A.  No.
4    Q.  And where particularly is the pain you have
5  in your head right now?
6    A.  On -- on both sides, just the side of my head
7  and my left ear.
8    Q.  Have you ever been to a sinus specialist or
9  throat --
10    A.  Ear nose --
11    Q.  -- ear nose doctor?
12    A.  Yes.
13    Q.  For allergies or anything like that?
14    A.  Just for sinus.
15    Q.  For sinus?  When did you go to that doctor?
16    A.  Oh, that's been -- I probably was 19 years
17  old.
18    Q.  All right.  Long time ago?
19    A.  Yes.
20    Q.  Did they ever take any x-ray of sinus
21  cavities or do any --
22    A.  I don't recall.
23    Q.  Do you have any allergies that you're aware
24  of?
25    A.  No.

Page 84

1    Q.  Ever been to an allergy doctor to be tested
2  for allergies?
3    A.  No.
4    Q.  All right.  So you say you've had a headache
5  now for about two weeks.  When was that last headache
6  you had before that?
7    A.  I don't recall.
8    Q.  Approximately how often do you have these
9  headaches?
10    A.  About every two months.
11    Q.  Once every two months and they last for a
12  certain amount of time?
13    A.  Yes.
14    Q.  Have you been able to connect it to an
15  activity, lack of sleep?  Is there anything that in
16  your mind seems to make the headaches come on or go?
17    A.  No.
18    Q.  They just suddenly appear and then they
19  disappear?
20    A.  Yes.
21    Q.  Now, before your fall on January 26th, 2006,
22  how often did you have headaches?
23    A.  Probably every six months, seven months,
24  something like that.
25    Q.  And how long would those headaches last when

Page 85

1  you had them?
2    A.  Maybe a couple of days.
3    Q.  And how would you rate those headaches on a
4  pain scale?
5    A.  I would say about a three, just a normal
6  headache.
7    Q.  Besides the headaches, is there any other
8  pains that you're attributing to your fall at the post
9  office?
10    A.  Yeah.  Because I still have some neck pain.
11    Q.  What type of neck pain?
12    A.  As if I'm -- as if my neck is tightened up.
13    Q.  Which part of your neck?
14    A.  The lower part of my neck.
15    Q.  In the back?
16    A.  In the back, uh-huh.
17    Q.  And what do you do to try to take care of
18  that?
19    A.  Just put a warm compress, relax.
20    Q.  Does that help?
21    A.  Somewhat.  It gives me some relief.
22    Q.  Now, before your fall on February 26th, is it
23  your testimony you never had neck pain before that?
24    A.  Never had neck pain before.
25    Q.  I said February 26th -- the January 26th

FALICIA RHODES v. UNITED STATES OF AMERICA                                    3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

23 (Pages 86 to 89)

Page 86

1  fall, 2006, you never had neck pain before that?
2      A.  No. January 27th.
3      Q.  Caught me again.  I got it wrong twice.
4          MR. LEWIS:  I was just looking at it myself.
5      Q.  And approximately how often do you have this
6  neck pain?
7      A.  Well, in the last six months, I've had pain
8  about every two month, about around the headaches,
9  when the headaches come on and it bothers -- my neck
10  hurts.
11     Q.  Have you ever tried to treat it with anything
12  like Aspercreme or any of those muscle -- topical
13  muscle pain relievers?
14     A.  Yes.
15     Q.  Does that help?
16     A.  No.
17     Q.  What ones have you tried using?
18     A.  I've tried the Therma something.  I'm not
19  sure.  And they make a patch as well, so.
20     Q.  And those haven't helped with your neck pain?
21     A.  No.
22     Q.  How about ibuprofen or other anti-
23  inflammatory drugs?
24     A.  No.
25     Q.  You haven't tried them or they haven't

Page 87

1  helped?
2      A.  They haven't helped.
3      Q.  But you've tried them?
4      A.  I'm sorry.  I've tried them.
5      Q.  But you haven't been to any doctor since
6  November for any pain you're suffering?
7      A.  No.
8      Q.  Besides the headaches and the neck pain, any
9  other pain you're suffering today that you attribute
10  to the fall?
11     A.  No.
12     Q.  Let me show you what is marked as Defendant's
13  Exhibit #9.
14         MR. DUBOIS:  Are we up to #9?
15         COURT REPORTER:  #7.
16     Q.  And let me direct your attention to
17  Defendant's Exhibit #7.  Is this a statement that you
18  prepared?
19     A.  Yes, it is.
20     Q.  Do you recall approximately when you prepared
21  this statement?
22     A.  No, I don't.  And that's unlike me not to put
23  a date on it.
24     Q.  Would you believe it was -- I'm looking for a
25  date on here.  It says my physical therapy ended on

Page 88

1  March 1st, so this was after you had completed your
2  physical therapy.  That's fair to say?
3      A.  Yes, uh-huh.
4      Q.  And the reason I'm asking, it says -- the
5  statement -- if you look at the second paragraph, it
6  says, I'm still suffering from a headache and I had to
7  stop wearing high heels, which was part of my everyday
8  attire.  I've had to adjust my footwear due to the
9  pain in my hip and lower back.  What are you referring
10  to in those two sentences?
11     A.  Well, I normally used to wear three to five-
12  inch heels but ever since I have fallen, I cannot wear
13  those heels anymore.  I've had to adjust.  All my life
14  I've worn high heels and now I've had to go to a lower
15  shoe due to the pain.  If I wear these heels long, I'm
16  going to start -- I'm going to start having pain.  So
17  I've had to adjust.
18     Q.  When you wear the heels, where do you get the
19  pain?
20     A.  In the hip area.
21     Q.  How often have you tried to wear --
22     A.  I've tried twice.
23     Q.  Twice?
24     A.  Uh-huh.
25     Q.  So since your fall, you haven't worn the two

Page 89

1  to three-inch high heels --
2      A.  No.
3      Q.  -- except for those two times, and both those
4  times caused you pain?
5      A.  That's correct.
6      Q.  When was the last time you tried to wear the
7  high heels?
8      A.  Probably about three months ago.
9      Q.  Are you currently on any medication?
10     A.  No.
11     Q.  Are you fully able to perform your job?
12     A.  Yes.
13     Q.  Haven't had to take any disability leave or
14  anything?
15     A.  Only when I had surgery.
16     Q.  And that was the surgery back in July of
17  2005?
18     A.  That's correct.
19     Q.  When did you first visit an attorney in
20  relation to your fall at the post office?
21     A.  I do not recall the actual date.
22     Q.  Did someone suggest you contact an attorney
23  or was that your own idea?
24     A.  That was my own idea.
25     Q.  Did you have any discussion about contacting

FALICIA RHODES v. UNITED STATES OF AMERICA                          3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

24 (Pages 90 to 93)

| Page 90 | Page 92 |
|---|---|
| 1 an attorney before you did so? | 1 Q. It was clear? Let me direct you back to |
| 2 A. No. | 2 Defendant's Exhibit #1. This will be response to the |
| 3 Q. You didn't talk to anyone about it? | 3 interrogatories. |
| 4 A. I talked to Hermette, my best friend. I'm | 4 A. Okay. |
| 5 sorry. | 5 Q. And interrogatory number nine asked you to |
| 6 Q. Did anyone refer you to a particular | 6 summarize the financial loss you have suffered in the |
| 7 attorney? | 7 lawsuit. You see it starts on page 3 and continues |
| 8 A. No. | 8 onto page 4. I want to briefly ask you a few |
| 9 Q. But you don't recall the first day that you | 9 questions about that. The first entry you have there |
| 10 met with an attorney? | 10 is Baptist East for -- let's see -- $1,129.70. Does |
| 11 A. No, I don't, because I -- I talked to two | 11 that relate to the emergency room visit? |
| 12 attorneys. | 12 A. Yes. |
| 13 Q. Who was -- were they both with this | 13 Q. And are you aware there is a lien placed on |
| 14 particular office? | 14 that amount? |
| 15 A. No, unh-unh. | 15 A. Yes. |
| 16 Q. Who was the other attorney you talked to? | 16 Q. So you haven't -- you have not paid that |
| 17 A. Thomas, Means, Gillis & Seay. | 17 amount? |
| 18 Q. Did you talk to them before talking to this | 18 A. No, I have not. |
| 19 office? | 19 Q. And that's the only time you went to Baptist |
| 20 A. Yes, uh-huh. They referred me to Mr. Lewis. | 20 East in relation to this fall was that emergency room |
| 21 Q. But you don't recall when that was? | 21 visit on the 27th of 2006? |
| 22 A. No, I don't. | 22 A. Yes. |
| 23 MR. DUBOIS: Let's make this Defendant's | 23 Q. All right. Next entry you have is |
| 24 Exhibit #8. | 24 Dr. Beauchamp for $291; is that right? |
| 25 Q. I handed you a document marked as Defendant's | 25 A. Yes. |

| Page 91 | Page 93 |
|---|---|
| 1 Exhibit #8. Do you recognize this document? | 1 Q. And you supplied some receipts. And from |
| 2 A. Yes, I do. | 2 what I can tell, these are for the visits you had with |
| 3 Q. Is this a -- I guess administrative complaint | 3 him and -- let's see. I think -- let me direct you to |
| 4 that was filed on your behalf against the postal | 4 Defendant's Exhibit #9, which I just handed you, which |
| 5 service? | 5 are documents produced on discovery. And I believe |
| 6 A. Yes. | 6 there are some copies of checks and receipts. It |
| 7 Q. And it looks like on the last page, is that | 7 looks like a couple of these are to Obelisk |
| 8 your signature? | 8 Healthcare. That's Dr. Beauchamp, right? |
| 9 A. Yes. | 9 A. Yes. |
| 10 Q. And the date you signed was April 3rd, 2006? | 10 Q. So this $291 that you've listed on Exhibit #1 |
| 11 A. Yes. | 11 for Dr. Beauchamp includes the first check for $105 |
| 12 Q. I guess it's fair to say sometime before | 12 for a visit on February 2nd, 2006, which is on the |
| 13 April 3rd, 2006, you went to see an attorney? | 13 first page of Defendant's Exhibit #9, right? |
| 14 A. Yes. | 14 A. Yes. |
| 15 Q. Let me jump back for a second. You said | 15 Q. And then there are two subsequent receipts on |
| 16 after you had fallen you had seen a puddle in the | 16 the next page of Defendant's Exhibit #9 for, looks |
| 17 floor of the post office? | 17 like 124 and $105; is that right? |
| 18 A. Yes. | 18 A. Yes. |
| 19 Q. All right. Did you put your hand in that | 19 Q. Now, are you aware of any other payments |
| 20 puddle, feel a temperature at all or -- | 20 you've made? Are those the only three payments you've |
| 21 A. No. | 21 made to Dr. Beauchamp that you're seeking recovery |
| 22 Q. Did you see anything floating in the puddle? | 22 for? |
| 23 A. No. | 23 A. Yeah. Now, actually, the copy of the check |
| 24 Q. And what was the color of the water? | 24 on February the 2nd and -- |
| 25 A. It was clear. | 25 Q. Right. That's the same? |

FALICIA RHODES v. UNITED STATES OF AMERICA                                    3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

25 (Pages 94 to 97)

Page 94

1    A.  Yeah.
2    Q.  Okay.  So there's 124, there's 105 -- and
3 that's right.  If you go to Defendant's Exhibit #5,
4 third page, you see at the top there is a receipt for
5 $62 paid for an office visit to Dr. Beauchamp on March
6 2nd, 2006?
7    A.  Yes.
8    Q.  So those are the three payments that make up
9 the $292 that's listed on page 4 of Defendant's
10 Exhibit #1?
11    A.  Yes.
12    Q.  Are there any other charges or expenses you
13 paid to Dr. Beauchamp?
14    A.  No.
15    Q.  And next entry you have on page 4,
16 Defendant's Exhibit #1 is for physical therapy for
17 $675 --
18    A.  Yes.
19    Q.  -- is that right?
20    A.  Yes.
21    Q.  I handed you a document that is marked as
22 Defendant's Exhibit #10.  Have you seen this document
23 before?
24    A.  Yes.
25    Q.  Is this a financial statement reflecting the

Page 95

1 charges by your physical therapy treatment?
2    A.  Yes.
3    Q.  And the $675 you have listed for physical
4 therapy is composed of two payments you made to them
5 for $125 each and then a balance of $425?
6    A.  Yes.
7    Q.  And are those the only charges or expenses
8 you've either paid or have pending with your physical
9 therapist?
10    A.  Yes.
11    Q.  The next entry you have on Defendant's
12 Exhibit #1, page 4 is for CVS for $58.87; is that
13 right?
14    A.  Yes.
15    Q.  And that would be for the three prescriptions
16 we talked about earlier, Naproxen, Darvocet and
17 hydrocodone?
18    A.  Yes.
19    Q.  Any other expenses that you've paid or you
20 owe the CVS Pharmacy?
21    A.  No.
22    Q.  The next entry is lost wages.  You have
23 $581.86.  How did you calculate that amount?
24    A.  I -- by the amount of money that I'm paid by
25 an hour and the days that I missed that I was docked

Page 96

1 for that -- for being out.
2    Q.  How many days of work did you miss?
3    A.  Four days.
4    Q.  Do you know what specific days?
5    A.  I don't recall the actual date.
6    Q.  I know there was one day we talked about
7 earlier when we received the doctor's note from
8 Dr. Beauchamp.  Aside from that day, do you know when
9 you missed these other three days?
10    A.  I don't recall the actual date.
11    Q.  Would you have any records from your employer
12 that would show which dates you missed?
13    A.  Yes.
14    Q.  Is that something you could get?
15    A.  Yes.
16    Q.  All right.  And you mentioned five trips to
17 physical therapy.  I'm looking at page 4, Defendant's
18 Exhibit #1.  In actuality, there are only four trips
19 to physical therapy; isn't that right?
20    A.  Yes.  And that may just be a typo on my part.
21    Q.  So you're only -- you're seeking the time you
22 missed -- you missed approximately three hours for
23 each trip to physical therapy, and then you missed
24 these other days?
25    A.  Yes.

Page 97

1    Q.  And they didn't -- basically was it all leave
2 without pay for those occasions?
3    A.  Yes.
4    Q.  And mileage, you have $133.40 listed on page
5 4 of Defense Exhibit #1?
6    A.  Yes.
7    Q.  How did you calculate that?
8    A.  Approximately how many miles it is from my
9 house to physical therapy each day.
10    Q.  Did you use MapQuest or something to figure
11 that out?
12    A.  No.
13    Q.  And that would -- of course, if you only made
14 four trips and not five, that would be reduced a
15 little bit?
16    A.  Yes.
17    Q.  Now, besides these financial expenses, out of
18 pocket expenses you've listed on page 4 of Defense
19 Exhibit #1, are you aware of any other expenses that
20 you attribute or are seeking recovery for in this
21 lawsuit?
22    A.  No.
23    Q.  All right.  Now, you also in your complaint
24 allege you're seeking some pain and suffering damages;
25 is that right?

FALICIA RHODES v. UNITED STATES OF AMERICA                          3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

26 (Pages 98 to 101)

Page 98

1    A. Yes.
2    Q. What do you base your claim for pain and
3  suffering damages on?
4    A. Well, I have a constant headache and neck
5  pain from this fall. I had to -- the pain after the
6  fall was very severe to the point that I was in bed
7  for three to four days, and my headaches have not gone
8  away since.
9    Q. And these are the headaches you told me about
10 earlier that seem to come every two months or so and
11 last for a period of time?
12   A. Yes.
13   Q. Is there anything else you're basing your
14 claim for pain and suffering on?
15   A. Well, I can't -- my dress attire has been
16 changed.
17   Q. And that's the allegation that you can't wear
18 the long --
19   A. Can't wear the heels.
20   Q. Does that in any way prevent you from doing
21 your job or anything?
22   A. No.
23      MR. LEWIS: As an aside, we're not going to
24 charge you for the 32 pairs of low heels she had to
25 purchase.

Page 99

1      MR. DUBOIS: I was going to ask that.
2    Q. Besides that, anything else?
3    A. Well, I've had to go out and buy new shoes.
4  I've had to because due to --
5    Q. Now it sounds like you are going to charge --
6      MR. LEWIS: We'll amend all of that.
7    A. Well, what I'm saying is that I've -- I've
8  always worn heels, and now I cannot wear the heels.
9  So that means I've got to go out and buy new shoes.
10   Q. Of course, you weren't wearing the heels on
11 the day you fell?
12   A. No. But I still had on a heel. It's just
13 that now I'm completely flat.
14   Q. Oh, now you're saying you can't wear any heel
15 at all?
16   A. I mean -- I'm just saying I can't wear the
17 three to five-inch heels. Yes, sir, that day I did
18 have on a heel but, you know, I can't wear what I'm
19 used to wearing.
20   Q. So no -- no inch heel; it has to be flat
21 soled?
22   A. Well, lately it has been flat soled, yes.
23 Everything has been the size that I had on the day at
24 the post office to completely flat.
25   Q. And did you have flat soled shoes in your

Page 100

1  shoe collection?
2    A. I can tell you approximately I had 10 pair.
3    Q. All right. And did you have to buy some
4  more?
5    A. Yes.
6    Q. How many more pair?
7    A. I have since then bought probably about 15
8  pairs of shoes.
9    Q. All right. And are you seeking recovery for
10 those shoes you bought?
11   A. Well, it's part of my attire, yes.
12   Q. How often do you wear those new shoes?
13   A. Well, I --
14   Q. I mean how often do you wear each shoe you
15 have? Let's see. Do you rotate them in and out?
16   A. I have to rotate them in and out.
17   Q. Do you have copies of the receipts for the
18 purchases of any shoes you purchased in the past year?
19   A. No, I don't.
20   Q. Where do you usually purchase shoes from?
21   A. This place called Shoe Time.
22   Q. Is that a store here in Montgomery?
23   A. Yes.
24   Q. In an average year, how many pairs of shoes
25 would you purchase?

Page 101

1    A. Average year, probably about 10 pair.
2    Q. Is there anything else you claim -- you base
3  your claim for pain and suffering on besides what you
4  just told me?
5    A. No.
6    Q. Haven't been to any doctors or psychiatrist
7  for any emotional or mental pain?
8    A. No.
9    Q. No other doctors or physicians, physical
10 therapist or anything other than the ones we talked
11 about?
12   A. No.
13   Q. Let's go to the first page of Defendant's
14 Exhibit #1. Interrogatory number one asks you to list
15 all witnesses you thought might have any knowledge of
16 any facts directly or indirectly related to the claims
17 set forth in the complaint. You see that?
18   A. Yes.
19   Q. And you listed Ms. Turner --
20   A. Yes.
21   Q. -- is that right? Is there anyone else
22 besides Ms. Turner that you've thought of since you
23 answered this interrogatory?
24   A. No.
25   Q. Now, Ms. Turner, how long have you known her?

FALICIA RHODES v. UNITED STATES OF AMERICA                    3/9/2007
DEPOSITION OF FALICIA ROSILAND RHODES

27 (Pages 102 to 105)

Page 102

1    A.  We have been best friends for 18 years.
2    Q.  So you met her back when you were in Ozark?
3    A.  Yes.
4    Q.  And how often through those 18 years have you
5  talked to her? I mean, do you talk to her on a daily
6  basis? Is she that type of friend -- or weekly basis,
7  monthly?
8    A.  We talk every day.
9    Q.  And what does Ms. Turner do?
10    A.  She's an aircraft mechanic for Lockheed
11  Martin.
12    Q.  And you have your address as Norcross,
13  Georgia. Do you know how long she's resided up there?
14    A.  Around five years.
15    Q.  How often does she come to visit you?
16    A.  Once a month.
17    Q.  And how often have you talked to her about
18  the allegations in this lawsuit?
19    A.  I don't recall how many times.
20    Q.  Do you talk about it frequently?
21    A.  No. I wouldn't say frequently, no.
22    Q.  All right. I'm going now to interrogatory
23  number two, which asks you to kind of describe the
24  information you thought the witnesses identified in
25  interrogatory number one might have. And you

Page 103

1  mentioned she had been a passenger in the vehicle when
2  you went to the post office, drove you to Baptist
3  East, was there when you got the treatment, and then
4  she was there in the home that first weekend, then
5  took you to some follow-up medical appointments. What
6  follow-up medical appointments are you referring to
7  there?
8    A.  She took me to the first doctor's appointment
9  I had with Dr. Beauchamp.
10    Q.  Did she take you to any other physical
11  therapy or medical appointments?
12    A.  No.
13    Q.  All right. Have you spoken to anybody else
14  about any allegations in your lawsuit besides
15  Ms. Turner, and I think you earlier said your mother?
16    A.  That's it. Just Ms. Turner and my mother.
17    Q.  All right. Do you have any statements,
18  videotape recordings from any witnesses or
19  individuals?
20    A.  No.
21    Q.  Did you take any photographs at Lagoon Park?
22    A.  No.
23    MR. DUBOIS:  Give me a second break. I think
24  we're just about done.
25    MR. LEWIS:  okay.

Page 104

1    (Brief recess)
2    Q.  Are there any questions that I asked you
3  earlier today that you didn't remember the answers to
4  that you now recall?
5    A.  No.
6    Q.  And is there any other evidence that you
7  believe supports your claims that we have not talked
8  about today?
9    A.  No.
10    MR. DUBOIS:  I'm finished.
11    MR. LEWIS:  Okay.
12    (The deposition concluded
13    at 11:12 a.m.)
14    * * * * * * * * * *
15    FURTHER DEPONENT SAITH NOT
16    * * * * * * * * * *

Page 105

1    REPORTER'S CERTIFICATE
2  STATE OF ALABAMA
3  CHILTON COUNTY
4    I, Wendy Lewis, Court Reporter and Commissioner
5  for the State of Alabama at Large, hereby certify that
6  on Friday, March 9, 2007, I reported the deposition of
7  FALICIA ROSILAND RHODES, who was first duly sworn or
8  affirmed to speak the truth in the matter of the
9  foregoing cause, and that pages 4 through 104 contain
10  a true and accurate transcription of the examination
11  of said witness by counsel for the parties set out
12  herein.
13    I further certify that I am neither of kin nor of
14  counsel to any of the parties to said cause, nor in
15  any manner interested in the results thereof.
16    This 11th day of April, 2007.
17
18
19
20
        WENDY LEWIS, Court Reporter
21       Commissioner for the State
        of Alabama at Large
22
        MY COMMISSION EXPIRES: 2/4/08
23
24
25

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

FALICIA RHODES,       *
  Plaintiff,        *
             *
    v.         *  **Civil Case No. 2:06-cv-554-WKW**
             *
UNITED STATES OF AMERICA,  *
  Defendant.       *

## PLAINTIFF'S ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES

   **COMES NOW** Plaintiff Falicia Rhodes, and in Answer to Defendant's First Set of
Interrogatories, pursuant to Rule 33 of the Federal Rules of Civil Procedure, states as follows:

1.  State the name, address, and telephone number (including area code) of each person whom
   Plaintiff believes had knowledge of, or may have knowledge of, any fact concerning,
   directly or indirectly, of the claim set forth in the Complaint.

**RESPONSE: Hermette Turner, 795 Lawndale Court, Norcross, GA 30093; (770) 337-6211.**

2.  For each individual listed in response to Interrogatory Number 1, supra, please state in
   detail, by individual, the specific information, opinions, facts, or knowledge that Plaintiff
   believes that such individual has regarding the claim in the Complaint.

**RESPONSE: After I fell, I went to my vehicle, where Ms. Turner was a passenger in my
     vehicle. Ms. Turner drove my vehicle to Baptist East and attended the entire
     time I received medical treatment. She also spent the entire weekend caring
     for me in my home, as well as caring for my two children. Ms. Turner also
     took me to follow-up medical appointments.**

3.  State the name and address of each person or organization by whom or with whom
   Plaintiff has been employed (including self-employment) from January 1, 2002, through
   the present, and, with respect to each, state:
   (A)  Dates of such employment;
   (B)  The nature of Plaintiff's work or duties;
   (C)  The place or places where such duties were performed;
   (D)  The average weekly, bi-weekly or monthly compensation received from each such
      employment and the basis for computing same, indicating the total amount of any
      compensation paid on account of overtime or holiday work during each such
      calendar year together with the amounts and basis for receipt of any special

1



bonuses.

**RESPONSE: Price Busters Furniture:**
    **(A)**    **2/28/02 through 6/26/03**
    **(B)**    **Assistant Store Manager**
    **(C)**    **on location at 1177 Andrews Ave., Ozark, AL 36360**
    **(D)**    **began at $6.0 per hour and ended with $7.00 per hour working full-time.**

    **I was unemployed from June 2003 until December 2003 due to being laid off. I drew unemployment during this time.**

    **OSI**
    **(A)**    **December 2003 through June 2004**
    **(B)**    **Phone operator**
    **(C)**    **on location in Executive Park, Montgomery, AL.**
    **(D)**    **$10.00 per hour for full-time employment.**

    **Buffalo Rock Pepsi**
    **( A)**    **June 25, 2004 to present**
    **(B)**    **Key Account Coordinator**
    **(C)**    **1200 Emory Folmar Blvd., Montgomery, AL**
    **(D)**    **Salary of $495.00 per week with incentive pay based on sales that vary.**

4.    State whether Plaintiff has had any accidents, illnesses, diseases or disabilities within the ten (10) years prior to the filing of this complaint; if so, please state:
    (A)    The nature of each such accident, illness or disability;
    (B)    The date of each;
    (C)    The place where each was sustained or suffered;
    (D)    The name and address of every person who was consulted to obtain medical care, advise, or treatment with respect to each accident, illness, disease or disability;
    (E)    The name and address of each hospital, clinic, or other institution in which you received any medical care, advise, or treatment with respect to each such accident, illness, disease or disability.
    (F)    With respect to each such accident, illness, disease or disability, state whether surgery was required, the surgical procedure performed, the period of time Plaintiff was disabled as a result of the surgery.

**RESPONSE: I have not had any other related accidents, illnesses, diseases, or disabilities other than having my children, ages 15 and 11, and a hysterectomy almost two years ago.**

5.    During the past twenty (20) years, state whether Plaintiff has been discharged from or left

employment due to health, or because of a specific injury, illness, or disability? If so, state:
- (A)    The date or dates on which Plaintiff left such employment.
- (B)    The employment from which Plaintiff was discharged or left.
- (C)    The circumstances surrounding each termination.
- (D)    The exact medical diagnosis of the condition which led to discharge or resignation.

**RESPONSE: No.**

6.    List, in chronological order, the name, address, and telephone number of each "health care provider" as defined in paragraph C above who rendered treatment to you during the ten (10) years prior to the incident(s) made the basis of this lawsuit.

**RESPONSE: Dr. Benjamin C. Griggs located in 495 Taylor Road, Montgomery, AL was the provider who did my hysterectomy. (334) 279-9333.**

7.    List, in chronological order, the name, address, and telephone number of each "health care provider" as defined in Paragraph C above who rendered medical treatment to Plaintiff subsequent to the incident(s) made the basis of this suit, and, for each physician or medical practitioner, identify his ir her medical specialty, the reason for Plaintiff's visit, and the dates of any treatment.

**RESPONSE: Baptist East, 400 Taylor Road, Montgomery, AL 36117; 334-277-8330; ER visit; January 27, 2006; Obelisk Health Care, 901 E. S. Blvd., Montgomery, AL 36116; 334-558-0262; follow up visit; January 20, 2006; InnerFit Inc., 7088 University Court, Montgomery, AL 36117; 334-396-1400; physical therapy; February 22, 2006**

8.    Please state whether Plaintiff has filed any claim or suit against any other party as a result of the incident made the basis of this suit; if so, please state:
- (A)    the name of the party or parties named;
- (B)    the status of all such claims or suits;
- (C)    the basis of each such claim or suit;
- (D)    if any such claim or suit has been settled, please state the amount of the settlement and the name of the party making such settlement;
- (E)    attach a copy of each such claim or suit to your answers to these interrogatories.

**RESPONSE: None.**

9.    Please state what, if any, financial losses Plaintiff seeks to recover as damages in this lawsuit. In answering this Interrogatory, itemize all medical bills, loss in wages or business, etc., stating with particularity the facts upon which such claims are based.

3

**RESPONSE: As of this date my out of pocket expenses are as follows:**

| | |
|---|---|
| **Baptist East** | **$1,129.70** |
| **Dr. Beauchamp** | **$291.00** |
| **Physical Therapy** | **$675.00** |
| **CVS** | **$58.87** |
| **Lost Wages** | **$581.86** |
| **( Even though I am a salaried employee, I was docked 4 days  - $12.38 per hour x 32 hours plus 5 trips to physical therapy missing 3 hours each trip)** | |
| **Mileage** | **$133.40** |
| **(290 miles x $0.46)** | |

|  |  |
|---|---|
| **TOTAL** | **$2,869.83** |

10.    State the name and address of each person whom Plaintiff expects to call as an expert witness in the trial of this actions, and with respect to each such person, state:

(A)    His field of expertise.

(B)    Any sub-specialties of the witness within his field of expertise.

(C)    The subject matter on which he is expected to testify.

(D)    The substance of the facts and opinions to which he is expected to testify.

(E)    A summary of the grounds for each of the opinions to which the expert is expected to testify.

(D)    The name and date of any treatises, books, articles, essays, or other writings, published or unpublished, by the expert, relating in any way to the subject matter on which he is expected to testify.  For each published work, state the title of the bok, journal, or other work in which it can be found and the name of the publisher.

**RESPONSE: Will submit in accordance with Federal Rules of Civil Procedure.**

Dated this the *1st* day of February, 2007.

*Falicia Rhodes*
FALICIA RHODES

SWORN TO AND SUBSCRIBED before me on this the *1st* day of February, 2007.

*Dana S. English*
NOTARY PUBLIC
My Commission Expires: *9/19/09*

(SEAL)

4

RESPECTFULLY SUBMITTED, this ___ day of February, 2007.

_____
JAY LEWIS (LEW031)
Plaintiff's attorney

OF COUNSEL:
LAW OFFICES OF JAY LEWIS, L.L.C.
P.O. Box 5059
Montgomery, AL 36103-5059
(334) 263-7733

### CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing document on the following parties or attorneys by hand delivery or by placing a copy of the same in the United States mail, properly addressed and first-class postage prepaid on this ___ day of February, 2007.

James J. DuBois
Assistant United States Attorney
P.O. Box 197
Montgomery, AL 36101-0197

_____
OF COUNSEL

5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA RECEIVED
### NORTHERN DIVISION

2005 JUN 21  A 10: 38

FALICIA RHODES,
    Plaintiff,

        v.

UNITED STATES OF AMERICA,
    Defendant.

\*
\*
\*
\*
\*
\*
\*
\*

Civil Case No.

## COMPLAINT

COMES NOW Plaintiff Falicia Rhodes against the above-captioned defendant and would

show unto the Court as follows:

### JURISDICTION AND VENUE

1.    Plaintiff files this Complaint and invokes the jurisdiction of this Court under and by

virtue of the Federal Tort Claims Act, 28 U.S.C. §1346 and 28 USC § 2672, et seq.

2.    The violations complained of herein occurred in Montgomery County, Alabama, and

were committed within the Middle District of the State of Alabama.

3.    Plaintiff has complied with the requirements the Federal Tort Claims Act by filing an

administrative claim with the United States Postal Service within the specified time and

has filed this Complaint within six months of her receipt of the May 5, 2006 denial of her

claim.  This suit is timely filed.

### PARTIES

4.    Plaintiff Falicia Rhodes (hereinafter, "Rhodes"), who is over the age of 19 years, is and at

all times material hereto was a citizen of the United States.  At some times material

1





hereto she was a resident of the State of Alabama, residing in Montgomery County, Alabama.

## FACTS

5.  Plaintiff expressly adopts in this section and all counts set forth subsequent hereto as if fully set forth herein the allegations in the foregoing paragraphs.

6.  On or about January 27, 2006, Rhodes was conducting business as a customer of the United States Postal Service facility on Plantation Way in Montgomery, Alabama.

7.  As Rhodes approached her post office box, she slipped and fell on a freshly-waxed and still-wet spot on the floor.

8.  There were no warning signs, pylons, or other devices present to warn Rhodes of the danger she faced.

9.  The danger was not open and obvious.

10.  Rhodes did not know and could not have known that the floor was wet until she slipped and fell.

11.  Rhodes hurt her lower back and her hip when she fell on the wet floor.

12.  Rhodes sought diagnosis and treatment at Baptist Medical Center East in Montgomery, Alabama, and has received follow-up care from Obelisk Healthcare in Montgomery, Alabama, for headaches, lower back pain, and hip pain.

13.  Rhodes is now disabled in one or more major life activities and the said disability may be permanent.

14.  Rhodes has suffered severe trauma, pain, physical suffering and emotional distress.

15.     Rhodes' injury was the proximate result of the lack of ordinary and reasonable care which should have been exercised by one or more employees or agents of the United States Postal Service.

## CAUSE OF ACTION

As to the following cause of action, Plaintiff expressly adopts as if fully set forth in the cause of action the allegations of all foregoing paragraphs.

## COUNT I – NEGLIGENCE, WANTONNESS AND/OR RECKLESSNESS UNDER THE FEDERAL TORT CLAIMS ACT

16.     United States Postal Service ("USPS") personnel are federal employees of the United States of America.

17.     Federal employees, whose names are presently unknown to Rhodes, caused the floor of the USPS facility to become wet with water and/or wax.

18.     The said federal employees were acting within the scope of their employment with the United States in creating a hazard for Rhodes.

19.     The acts of the USPS and/or its agents or employees were negligent, wanton and/or willful in failing or refusing to mark or otherwise warn of the hazard thereby created and caused personal injury to Rhodes.

20.     USPS employees had actual notice and/or had constructive notice of this condition and/or failed to exercise reasonable care with respect to the maintenance of its premises, thereby negligently, wantonly, willfully and recklessly failing to discover and remove this condition.

21.     Rhodes hurt her back and hip when she fell.

3

22. Rhodes is now disabled in one or more major life activities and the said disability may be permanent.

23. Rhodes has suffered severe trauma, pain, physical suffering and emotional distress, such as but not limited to: traumatizing headaches, severe pain to the lower back, pain after standing for long periods of time, and inability to wear the shoes she formerly wore. Rhodes will continue to suffer as a result of the negligent, wanton, willful and reckless acts of the defendant's employees.

<b><u>PRAYER FOR RELIEF</u></b>

WHEREFORE, Plaintiff demands judgment in her favor and against the defendant, as follows:

a) Grant to Rhodes damages of Fifty Thousand Dollars ($50,000.00) for violations of 28 USC § 2672, et seq.

b) Grant Rhodes the cost of this action including attorney's fees and expenses;

c) Grant such other, further and different relief, both legal and equitable, as this Court may deem just and proper.

RESPECTFULLY SUBMITTED on this the 20th day of June, 2006.

**FALICIA RHODES**

JAY LEWIS, Attorney for Plaintiff

4

OF COUNSEL:
LAW OFFICES OF JAY LEWIS, LLC
P.O. Box 5059
Montgomery, AL 36103
(334) 263-7733 (Voice)
(334) 832-4390 (Facsimile)
ASB-2014-E66J
J-Lewis@JayLewisLaw.com

STATE OF ALABAMA            )
COUNTY OF MONTGOMERY        )

      **BEFORE ME**, a Notary Public in and for said County and State, came **Falicia Rhodes**, whose name is signed to the foregoing Complaint and who is known to me, and acknowledged before me on this date that being informed of the contents of this Complaint, she executed the same voluntarily on the day the same bears date.

      **GIVEN** under my hand and official seal this 20th day of June, 2006.

**NOTARY PUBLIC**
My commission expires: 9/19/07

**(SEAL)**

5

①



②



*Falicia Rhodes*
*Customer Accident* A5



JAN 27 2006
MONTGOMERY AL 36121-9998 USPS
LAGOON PARK STA

Customer entered through
doorway, turned to left
heading to P.O. boxes

③

Customer's
Box



lobby
table

Falicia Rhodes
286-1193
P.O. Box 211074
Montgomery, AL
36121

Circled area
is where
customer slipped.

DEFENDANT'S
EXHIBIT
3

④

⑤ Front

 

View walking
away from
P.O. box. ④



A.S.
Falicia Rhodes
Customer
Accident

Customer fell in front of
red lobby table approximately
in a line with frame of
window ⑤

⑥

⑦

 

Floor View

View walk up close to

View from door of lobby





**Baptist Health**

**I/P AND O/P**
**ADMISSIONS AND FACESHEET**

0602700566    RHODES,FALICIA R

| FC 29 | INIT SDR |
|---|---|

| PATIENT NO. 0602700566 | DATE 01/27/06 | TIME 1657P | SEX F | DOB/AGE 04/21/70  35Y | FA# 2 | MS D | TYPE EER | SER ER | STATION ROOM/BED EER / | MED REC NO. 258487 |
|---|---|---|---|---|---|---|---|---|---|---|

**PATIENT**

NAME & ADDRESS
RHODES,FALICIA R
PO BOX 211074

MONTGOMERY    AL 36117

SS# ▮▮▮▮▮
PH# (334)286-1192
COUNTY    MONTGOMERY

EMPLOYER
BUFFALO ROCK
1200 EMORY FOLMAR BL

MONTGOMERY  AL 36110

EMP PH# (334)394-4434
OCC
EMP STAT  EMP FULL TIME
EMP I.D.

**GUARANTOR**

NAME & ADDRESS
RHODES,FALICIA R
PO BOX 211074

MONTGOMERY    AL 36117

DOB
AGE  ▮▮▮▮▮
SS# 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
PH# (334)286-1192
REL  SELF

EMPLOYER
BUFFALO ROCK
1200 EMORY FOLMAR BL

MONTGOMERY  AL 36110

EMP PH# (334)394-4434
OCC
EMP STAT  EMP FULL TIME
EMP I.D.

**RELATIVE**

NAME & ADDRESS
LOWE,LORENE
VANDY DRIVE

MONTGOMERY    AL 36108

DOB
AGE
SS#
PH# (334)265-5624
REL  AUNT

EMPLOYER

OCC
EMP STAT  NOT EMPLOYED
EMP I.D.

**REL 2**

NAME & ADDRESS

HM
PH#
WK

**INS # 1**

| INSURANCE CARRIER | PH# | INSURED NAME | REL. TO INSURED |
|---|---|---|---|
| SUBSCRIBER ID# | GROUP NAME | | |
| GROUP PHONE# | APPROVAL# | GROUP NUMBER | |
| CONTACT ADDRESS | | CONTACT | |
| | | CITY/STATE/ZIP | |

**INS # 2**

| INSURANCE CARRIER | | INSURED NAME | REL. TO INSURED |
|---|---|---|---|
| SUBSCRIBER ID# | GROUP NAME | | |
| GROUP PHONE# | APPROVAL# | GROUP NUMBER | |
| CONTACT ADDRESS | | CONTACT | |
| | | CITY/STATE/ZIP | |

**INS # 3**

| INSURANCE CARRIER | | INSURED NAME | REL. TO INSURED |
|---|---|---|---|
| SUBSCRIBER ID# | GROUP NAME | | |
| GROUP PHONE# | APPROVAL# | GROUP NUMBER | |
| CONTACT ADDRESS | | CONTACT | |
| | | CITY/STATE/ZIP | |

| DIAG CODE | DIAGNOSIS NECK & LEFT SIDE PAIN, HEADACHES | ALLERGIES | P | PT. CL. |
|---|---|---|---|---|

| ACCIDENT TYPE OTHER/LIABILITY | NATURE OF ACCIDENT FELL/LEFT SIDE PAIN & NE | ACCIDENT DATE 01/27/06 | TIME 1445P |
|---|---|---|---|

| ARRIVAL MODE FAMILY DRIVEN | REFERRING FACILITY | CHURCH/DENOMINATION |
|---|---|---|

| ADMITTING PHYSICIAN 915 FALERO,WALLACE G | PRIMARY CARE PHYSICIAN NO,PCP |
|---|---|

| ATTENDING PHYSICIAN | REFERRING PHYSICIAN 915 FALERO,WALLACE G |
|---|---|

| LOCATION | E/R PHYSICIAN |
|---|---|

ADMISSION TYPE
EMERGENCY

DEFENDANT'S EXHIBIT 4



FS 100    PRINTED BY: mmcgraw    DATE 11/20/2006    Last Printed:  01/27/2006 17:25:42
Yes    EE8

E0602700566  RHODES,FALICIA R
DOB: 04/21/70  Age:35Y  MR #:258487
Admit Date/Time: 01/27/06  1657P
915 FALERO,WALLACE G

**Baptist** HEALTH
**ER RECORD - Adult / Adolescent**

Regular M.D. _Higgs_    Notified: _____
Immunization Hx: Tetanus ☒ UTD  ☐ not UTD  ☐ Latex Allergy
Allergies: _NKDA_

LMP _Nost_    Pregnant? ☐ Yes  ☐ No  ☐ Unsure
Home Meds: ☐

PMH: _____

**TRIAGE CATEGORY (Circle one)**
1) RED - Immediate    2) YELLOW - Urgent    3) GREEN - 0 Non-Urgent

| B/P | Pulse | Resp | Temp | SaO2 | Pain | ☐ See T-sheet |
|---|---|---|---|---|---|---|

Arrived via: ☒ Car  ☐ Ambulance  ☐ Other ____

Pre Hospital Care: ☐ O2    ☐ IV    ☐ Splints ____
☐ Other: ____    ☐ ASA

**AGE SPECIFIC CARE**

13-18 yrs (Adolescent)
(Menarche started ☐ Yes  ☐ No   Age at onset? _____   Regular ☐ Yes ☐ No?)
>65 yrs (Older Adult)
Assisting Devices: ☐ None  ☐ Yes (list): ____
Living arrangements: ☐ Lives alone  ☐ Family/Significant Others
☐ Extended Care Facility

**GENERAL APPEARANCE & MENTAL STATUS**

| General | Skin Temp | Respiration | Pulse | Mental Status |
|---|---|---|---|---|
| ☐ NAD | ☐ Warm | ☐ Unlabored | ☐ Regular | ☐ Alert |
| ☐ Mild Distress | ☐ Hot | ☐ Clear Bilat. | ☐ Irregular | ☐ Oriented |
| ☐ Acute Distress | ☐ Cool | ☐ Shallow | ☐ Bounding | ☐ Age Approp. |
| | ☐ Cold | ☐ Labored | ☐ Weak | ☐ Anxious |

| Skin Color | Skin Moisture | | Neuro Status | ☐ Combative |
|---|---|---|---|---|
| ☐ Pink | ☐ Dry | ☐ Wheezes | | ☐ Unresponsive |
| ☐ Flushed | ☐ Diaphoretic | ☐ Crackles | ☐ Normal | ☐ Tearful |
| ☐ Pale | | ☐ Apneic | Gait | ☐ Slurred Speech | ☐ Confused |
| ☐ Ashen | | ☐ Retraction | ☐ Steady | ☐ Weakness L/R | ☐ Agitated |
| ☐ Cyanotic | | ☐ Nasal Flaring | ☐ Unsteady | ☐ Aphasia | ☐ Disoriented |
| ☐ Jaundiced | | ☐ Stridor | Visual Acuity: O.S.: ____   O.D.: ____   O.U.: ____ |

**PLAN OF CARE**

| Problems | Intervention |
|---|---|
| ☐ Anxiety/Fear    ☐ Nutrition (refer to Dietitian) | ☐ Anti-Pyretic    ☐ Sling/Splint |
| ☐ Body Temp, Alt. In   ☐ Knowledge Deficit | ☐ Bleeding Control   ☐ Teaching |
| ☐ Comm. Alt. In    ☐ Neuro Status | ☐ DSG/Wound Care   ☐ Labs |
| ☐ Coping Alt. In    ☐ Physical Mobility | ☐ Emotional support   ☐ X-Ray |
| ☐ Elimination Alt. In   Impairment | ☐ Ice/elevate   ☐ Meds As Ordered |
| ☐ Fluid Vol., Def/Ex    ☐ Resp. Function Alt. | ☐ I & O    ☐ O2 |
| ☐ Infection Potential   ☐ Skin Integrity, Alt. In | ☐ Other ____ |
| ☐ Domestic Violence    ☐ Abuse/Neglect | |
| (refer ie Case Mgmt.)   ☐ Cultural/Religion | |
| ☐ Pain    ☐ Language | Time To Tx Area: _1905_  Rm # _1_ |
| ☐ Other ____ | |

| ☐ Animal Control | ☐ PT | Weight: _182_ ☐ stated/measured |
| ☐ DHR Referral | ☐ Dietitian | Triage Nurse Signature: _____ |
| ☐ Police | ☐ Coroner | Date ____ Time ____ |

**☐ TILT TEST**
B/P: ____  P: ____
B/P: ____  P: ____
B/P: ____  P: ____
Time Performed: ____

**NURSES NOTES**    ☐ SEE FLOW SHEET

1905 - _____
2030 = Discharge instructions given, pt c understanding ____

**PHYSICIAN'S ORDERS**

| Medication | Dose | Route | Time Admin | Site | Comments | Signature |
|---|---|---|---|---|---|---|
| Toradol | 60mg | IM | 1154 | | | |
| | | | | (no meds to med) | | |

**DISCHARGE**
Date 7/10  Time 2030

**VITAL SIGNS**
| B/P | T | P | R | O2 Sat | Pain |
|---|---|---|---|---|---|

☐ Patient education provided on discharge instructions.
D/C Nurse: _____

**DISPOSITION**
☐ Home    **EXIT VIA**
☐ Admit to Rm#: ____    ☐ Walk
☐ Surgery    ☐ WC
☐ Transfer to: ____
☐ EXP    ☐ Ambulance
☐ AMA    **ACCOM. BY**
☐ LWT    ☐ Self
☐ SNF    ☐ Fam/Friend
☐ Other    ☐ Police
☐ M.D. Office    ☐ Other

Physician Signature: _____

EXTENDER _____

Certified Medical Emergency
☐ Yes   ☐ No

**M.D. ORDERS**
(per BMC Protocol)

| | Time Performed | Site | Size | Comments | Signature |
|---|---|---|---|---|---|
| O2 | | | | | |
| IV | | | | | |
| NGT | | | | | |
| Foley / Quick Cath | | | | | |
| Set up Laceration Tray/ Lumbar puncture | | | | | |
| Accucheck | | | | | |
| Splint | | | | | |
| Pulse Ox | | | | | |
| Tetracaine and Stain | | | | | |
| Pelvic exam set up | | | | | |
| Cardiac | | | | | |

FORM ER 16002 REV. 02/17/05





E0602700566   RHODES, FALICIA R
DOB: 04/21/70  Age: 35Y   MR #: 258487
Admit Date/Time: 01/27/06  1657P
915 FALERO, WALLACE G

© 1996 - 2004 T-System, Inc. Circle or check affirmatives, backslash (\) negatives.

**19**   Baptist Health

# EMERGENCY PHYSICIAN RECORD
## Fall  (5)

DATE:_____  TIME: 1915  ROOM: H1 __ EMS Arrival
HISTORIAN:  patient  spouse  paramedics_____
__HX / _EXAM UNOBTAINABLE 2° TO:

## HPI

**chief complaint:** Fall  Injury to: (L) hip, neck

| occurred: | where: | |
|---|---|---|
| just PTA | home | school |
| today | neighbor's | city park |
| yesterday | work | street |
| _____days PTA | Post Office | |

**context:**
tripped / slipped / lost balance     alleged assault
became dizzy / fainted                bicycle (helmet? Y N)
fell from ( standing position / from height )

_slipped on floor at post office_
_which she reports as having been waxed_

| location of pain / injuries: | –right– | | –left– | |
|---|---|---|---|---|
| | shldr | hip | shldr | (hip) |
| head  face  mouth | arm | thigh | arm | (thigh) |
| (neck) chest  abdomen | elbow | knee | (elbow) | (knee) |
| back  upper mid- lower | f-arm | leg | f-arm | leg |
| radiating to R / L thigh / leg | wrist | ankle | wrist | ankle |
| | hand | foot | hand | foot |

**severity of pain:**           **associated symptoms:**
(mild)                          lost consciousness / dazed
                                  duration:
moderate                          remembers:
                                  impact   coming to hospital
severe                            seizure

**PAST HX**   negative   HTN   DM  CAD _____

Meds-  none / see nurses note
Allergies-  NKDA / see nurses note

## SOCIAL HX   recent ETOH  smoker  drug abuse

## FAMILY HX   DM  HTN  CAD_____

__HX / _EXAM UNOBTAINABLE 2° TO: _____
**ROS** ☑ all systems neg except as mkd   CVS
**NEURO**                                 chest pain
loss feeling / power arms/legs            GI
headache                                  nausea / vomiting
**EYES**                                  GU
double vision                             loss of bladder function
**ENT**                                   SKIN
hearing loss                              skin laceration
**RESPIRATORY**                           CONST
trouble breathing                         recent fever / illness

## PHYSICAL EXAM
**General Appearance** __c-collar ( PTA / in ED ) / backboard__
  no acute distress      __mild / moderate / severe distress____
  alert                  __anxious / lethargic____
                         __IV____
**HEAD**                 __see diagram____
  no evidence of         __Battle's sign / Raccoon Eyes____
  trauma

**NECK**                 see diagram
  non-tender             __vertebral point-tenderness____
  painless ROM           muscle spasm / decreased ROM
  trachea midline        pain on movement of neck

**EYES**                 __unequal pupils  R-___mm  L-___mm
  PERRL                  __EOM entrapment / palsy____
  EOMI                   __subconjunctival hemorrhage____

**ENT**                  __hemotympanum____
  nml external           __TM obscured by wax____
  inspection             __clotted nasal blood____
  no dental injury       __dental injury / malocclusion____

**RESP / CVS**           __see diagram ( on reverse )____
  chest non-tender       __decreased breath sounds____
  breath sounds nml      __wheezing / rales____
  heart sounds nml       __splinting / paradoxical movements____

**GASTROINTESTINAL**     __see diagram ( on reverse )____
  non-tender             __tenderness / guarding / rebound____
  no organomegaly        __mass / organomegaly____

**GENITAL / RECTAL**     __perineal hematoma
  __nml genital exam     __blood at urethral meatus
  __nml vaginal exam     __decreased rectal tone____
  __nml rectal exam
  __heme negative stool

**NEURO / PSYCH**        __confusion / disorientation
  oriented x3            __EOM palsy / anisocoria____
  mood & affect nml      __facial asymmetry____
  CN's nml               __unsteady / ataxic gait____
  as tested              __sensory / motor deficit____
  sensation &
  motor nml

EWM                      RN / PA / NP                    MD
HISTORY  RN / PA / NP sign after recording history, physician initial
after reviewing with patient and confirming or revising all elements.

1 of 1   1 of 2

☑ Nursing Assessment Reviewed  ☑ Vitals Reviewed  ☐ Tetanus immun. UTD

Reflexes

**SKIN**
__ see diagram_____
__ intact     __ crepitus / diaphoresis_____
__ warm, dry

**BACK**
__ no CVA          __ see diagram_____
  tenderness      __ vertebral point-tenderness
__ no vertebral    __ CVA tenderness_____
  tenderness       __ muscle spasm / limited ROM_____

**EXTREMITIES**
__ atraumatic      __ see diagram_____
__ pelvis stable   __ bony point-tenderness
__ hips non-tender __ painful / unable to bear weight
__ no pedal edema  __ pulse deficit_____
__ nml ROM

Joint Exam:_____
__ limited ROM / ligaments laxity / joint effusion



**XRAYS** ☑Interp. by me ☐Reviewed by me ☐Discssd w/ radiologist

**C-Spine   D-Spine   LS-Spine**
__ nml / NAD       __ reversal / straightening of cerv. lordosis
__ no fracture     __ DJD / spondylosis / spurring_____
__ nml alignment
__ soft tissues nml

**CXR**
__ nml / NAD       __ rib fracture_____
__ no infiltrates  __ infiltrate / atelectasis_____
__ nml heart size    Left hip. No fracture
__ nml mediastinum

**OTHER** ☐See separate report

**CT SCAN**
__ normal



T=Tenderness
PtT=Point Tenderness
S=Swelling
E=Ecchymosis
Lac=Laceration
A=Abrasion  B=Burn
(Ø=without  m=mild
mod=moderate
sv=severe)
Tsv = Tenderness on
palpation (severe)

Fall - 19

PRINTED BY: mmcgraw

**LABS:**

| CBC | Chemistries | CO2_____ | UA |
|---|---|---|---|
| normal except | normal except | Ca_____ | normal except |
| WBC_____ | BUN_____ | Bilirubin | WBC_____ |
| Hgb_____ | Creat_____ | . | RBC_____ |
| Hct_____ | Gluc_____ | Magnesium_____ | bacteria_____ |
| Platelets_____ | Alk Phos_____ | BNP_____ | dip:_____ |
| segs_____ | ALT_____ | D-Dimer_____ | _____ |
| bands_____ | AST_____ | _____ | _____ |
| lymphs_____ | Na_____ | _____ | _____ |
| monos_____ | K_____ | _____ | _____ |
| eos_____ | Cl_____ | | |

**EKG** __NML  ☐Interp. by me   ☐Reviewed by me  Rate_____
__NSR  __nml intervals  __nml axis  __nml QRS  __nml ST/T

**PROGRESS:**

| Re-evaluation time_____ | unchanged | improved | re-examined |
|---|---|---|---|
| Re-evaluation time_____ | unchanged | improved | re-examined |
| Re-evaluation time_____ | unchanged | improved | re-examined |

O2 Sat 98 % RA nml.

E0602700566  RHODES,FALICIA R
**TREATMENT:__**  DOB: 04/21/70  Age:35Y  MR #:258487
**MEDICAL DECI**  Admit Date/Time: 01/27/06  1657P
__ use template #:  915 FALERO,WALLACE G

**Fracture Care: Follow up with orthopedic within 48 hours**
☐Rx given   Naproxes

☐Follow up with  Prinay MD

Relinquished care to Dr._____  Time:_____
__ Discussed with Dr._____  CRIT CARE- 30-74 min
  will see patient in: _office / ED / hospital   75-104 min _____ min
  Counseled patient / family regarding:  __Prior records ordered
  ☐lab results  diagnosis  need for follow-up  __Additional history from:
  __ Admit orders written  family caretaker paramedics

**CLINICAL IMPRESSION:**  Fall

| contusion | Neck | | sprain / strain |
|---|---|---|---|
| head | wrist | R / L | neck  dorsal  lumbar |
| face , | hand | R / L | sacral _____ |
| chest | hip | R ☑ | **concussion** |
| abdomen | thigh | R / L | with LOC    w/o LOC |
| back | knee | R / L | |
| shoulder  R / L | leg | R / L | **laceration** |
| arm   R / L | ankle | R / L | |
| elbow   R / L | foot | R / L | **injury** |
| forearm  R / L | | | |

**DISPOSITION-**  ☑home  ☐ admitted  ☐ transferred
**CONDITION-**  ☐ unchanged  ☐ improved  ☑ stable

x_____  MD / DO  x_____  MD /DO
   Resident                          Attending
☐ Ht review. Patient interviewed. Medical Decision Making, and Examined by
Physician
DATE 11/20/2006



E0602700566   RHODES, FALICIA R
DOB: 04/21/70  Age: 35Y  MR #: 258487
Admit Date/Time: 01/27/06  1657P
915 FALERO, WALLACE G



**Baptist Health**
**Emergency Room**
**Discharge Instructions**

Page 1 of 1

DISCHARGE INSTRUCTIONS - PATIENT COPY

| Weight | Phone | Allergies | | Location **South** |
|--------|-------|-----------|--|--------|

| **MEDICINES PRESCRIBED** | If non, check this box: ☐ | **VOID IF NOT PRINTED WITH CRANBERRY BACKGROUND.** |
|--|--|--|

| Name/Strength | Number | Schedule / Duration | No Refills | Refills |
|---------------|--------|---------------------|------------|---------|
| 1. _Nifikk 500_ _#20 - 1 to Po 1-1D with meal_ | | | ☐ | |
| 2. | | | ☐ | |
| 3. | | | ☐ | |
| 4. | | | ☐ | |
| 5. | | | ☐ | |

---

**INSTRUCTION SHEET(S) GIVEN**

| ☐ Asthma | ☐ Crutches | ☐ Head Injury | ☐ Threatened Ab | Return for signs of infection |
|----------|------------|---------------|------------------|-------------------------------|
| ☐ Back Pain | ☑ Fever | ☐ Otitis Media | ☑ Vomiting / Diarrhea | > Redness |
| ☐ Cast / Splint Care | ☐ Fracture | ☐ Sprains / Bruises | ☐ Wound Care | > Swelling |
| | | ☑ STD | ☐ Other(s)_____ | > Drainage |
| | | | | > Heat |

Additional Instructions:

_Cold compress a 24 hours Ts affected area_
_Then warm compress_

---

Referred to: _Primary Care MD_
☑ Dr. _Primary Care MD_
Phone: _____
☐ Call on next business day for follow-up appointment
in _____ days / weeks    ☐ next available

☐ Return to Emergency Dept. in _____ hours / days for recheck
☑ If no improvement or your condition worsens, call your private physician
   or return to the Emergency Department for a recheck.
☐ Learning needs assessed   ☐ Instructions Modified: _____
☑ Education provided on new medication _____

I understand that the treatment I have received was rendered on an emergency basis and is not meant to replace complete care from a primary care provider or clinic. Furthermore, I may have been released before all of my medical problems were apparent, diagnosed, and/or treated. If my condition worsens, I have been instructed to call my primary care provider or return to this facility or the nearest emergency center. I understand that I should NOT drive or perform hazardous tasks if my medication or treatment causes drowsiness. I have read and understand the above, received a copy of this form and applicable instruction sheets, and I will arrange for follow-up care. If diagnostic tests indicate a need for modification in therapy, you will be notified at the phone number you provided.

x _[signature]_
☑ Patient
☐ Relative
☐ Other_____

Time Released > _2030_ Hrs.

Instructed By: _[signature]_    Physician: _[signature]_

---

**WORK/ SCHOOL STATEMENT from the Emergency Department**

| Patient Name | Date |
|--------------|------|

☐ Patient was seen by Dr.
☐ No athletics / physical education: _____ days*
☐ May return to work / school without restrictions
☐ Will require time off work / school. Estimated time: _____ days*
☐ Must be reevaluated by family / occupational physician before
returning to school/work.

☐ May return to restricted duties for_____ days*
Restrictions: _____
☐ ------------------------ was here with relative/ child.
☐ Other: _____

INSTRUCTED BY: mmcgraw   DATE 11/20/2006

Time off from School or Work longer than 3 days should be approved by a Personal or Company/ Occupational Medicine Physician, unless otherwise stated.

BSB-0082 (06/02)

DX Cervical spine complete                    RHODES, FALICIA R - E000258487

Result type:        DX Cervical spine complete
Result date:        January 27, 2006 19:50
Result status:      Auth (Verified)
Verified by:        LeQuire, Mark H, MD on January 28, 2006 17:14
Encounter info:     BAPTIST EAST, Emergency Room, 01/27/06 - 01/27/06

**Reason For Exam**
fall/pain

**FINDINGS**
RHODES, FALICIA R.

CERVICAL SPINE, 1/27/06 (SIX VIEWS):

The bodies are of normal height. Disc interspaces are not narrowed. Alignment remains anatomic. Prevertebral soft tissues are of normal thickness. The odontoid is intact.

IMPRESSION: NEGATIVE.

**Signature Line**
ELECTRONICALLY SIGNED BY: LeQuire, Mark H, MD

TECHNOLOGIST: ZH
TRANSCRIBED DATE AND TIME: 01/28/2006 10:05
TRANSCRIPTIONIST: jh

**Completed Action List:**
* Perform by Henry, Zebedee, ARRT (R) on January 27, 2006 19:50
* Order by DeJesus, Dante V, MD on January 27, 2006 19:27
* VERIFY by LeQuire, Mark H, MD on January 28, 2006 17:14

# DX Hip Complete Left

## RHODES, FALICIA R - E000258487

Result type:       DX Hip Complete Left
Result date:       January 27, 2006 19:50
Result status:     Auth (Verified)
Verified by:       LeQ ire, Mark H, MD on January 28, 2006 17:14
Encounter info:    BAPTIST EAST, Emergency Room, 01/27/06 - 01/27/06

**Reason For Exam**
fall/pain

**FINDINGS**
RHODES, FALICIA R.

LEFT HIP, TWO VIEWS 1/27/06:

No significant skeletal, articular, or soft tissue changes are demonstrated.

IMPRESSION: NEGATIVE.

**Signature Line**
ELECTRONICALLY SIGNED BY: LeQuire, Mark H, MD

TECHNOLOGIST: ZH
TRANSCRIBED DATE AND TIME: 01/28/2006 10:03
TRANSCRIPTIONIST: jh

**Completed Action List:**
* Perform by Henry, Zebedee, ARRT (R) on January 27, 2006 19:50
* Order by DeJesus, Dante V, MD on January 27, 2006 19:27
* VERIFY by LeQuire, Mark H, MD on January 28, 2006 17:14

E0602700566   RHODES, ...ICIA R
DOB: 04/21/70  Age:35Y  MR #:258487
Admit Date/Time: 01/27/06  1657P
915 FALERO, WALLACE G



**Baptist Health**
## Emergency Room
## Discharge Instructions

Page 1 of 1

DISCHARGE INSTRUCTIONS - MEDICAL CHART

| Weight | Phone | Allergies | | Location **South** |
|---|---|---|---|---|

**MEDICINES PRESCRIBED**   If non, check this box: ☐   **VOID IF NOT PRINTED WITH CRANBERRY BACKGROUN**

| Name/Strength | Number | Schedule / Duration | No Refills | Refills |
|---|---|---|---|---|
| 1. | | | ☐ | |
| 2. | | | ☐ | |
| 3. | | | ☐ | |
| 4. | | | ☐ | |
| 5. | | | ☐ | |

**INSTRUCTION SHEET(S) GIVEN**

☐ Asthma       ☐ Crutches     ☐ Head Injury      ☐ Threatened Ab       Return for signs of infection
☐ Back Pain    ☐ Fever        ☐ Otitis Media     ☐ Vomiting / Diarrhea   > Redness
☐ Cast / Splint Care  ☐ Fracture  ☐ Sprains / Bruises  ☐ Wound Care        > Swelling
                                  ☐ STD              ☐ Other(s) _____    > Drainage
                                                                            > Heat

Additional Instructions:

_Cold Compress x 24 hours to affected area_
_Then warm compress_

Referred to:
☑ Dr. _Pinning Paul MD_
☐ Phone: _____
☐ Call on next business day for follow-up appointment
   in _____ days / weeks      ☐ next available

☐ Return to Emergency Dept. in _____ hours / days for recheck
☑ If no improvement or your condition worsens, call your private physician
   or return to the Emergency Department for a recheck.
☐ Learning needs assessed    ☐ Instructions Modified: _____
☑ Education provided on new medication _____

I understand that the treatment I have received was rendered on an emergency basis and is not meant to replace complete care from a primary care provider or clinic. Furthermore, I may have been released before all of my medical problems were apparent, diagnosed, and/or treated. If my condition worsens, I have been instructed to call my primary care provider or return to this facility or the nearest emergency center. I understand that I should NOT drive or perform hazardous tasks if my medication or treatment causes drowsiness. I have read and understand the above, received a copy of this form and applicable instruction sheets, and I will arrange for follow-up care. If diagnostic tests indicate a need for modification in therapy, you will be notified at the phone number you provided.

**X** _Alicia Rhodes_         ☐ Patient
                              ☐ Relative       Time
                              ☐ Other_____   Released  **>** 2030 Hrs

Instructed By: _Frida Bru_                      Physician:

**WORK/ SCHOOL STATEMENT from the Emergency Department**

Patient Name                                    Date

☐ Patient was seen by Dr.                       ☐ May return to restricted duties for_____ days*
☐ No athletics / physical education: _____ days*    Restrictions: _____
☐ May return to work / school without restrictions    _____
☐ Will require time off work / school. Estimated time: _____ days*  ☐ ------------------------- was here with relative/ child.
☐ Must be reevaluated by family / occupational physician before  ☐ Other: _____
   returning to school / work.

Time off from School or Work longer than 3 days should be approved by a Personal or Company/ Occupational Medicine Physician, unless otherwise stated.

BSB-0082 (06/02

**CVS/pharmacy** #4869   Ph:334.271.5861   CUSTOMER RECEIPT

6990 ATLANTA HWY
MONTGOMERY, AL
36117-0000

07 0753008 00 0002279

**RHODES, FALICIA**
3 ANNE ST, OZARK, AL 36360-0000
Ph:334.000-0000   DOB:04-21-1970
**PROPOXY-N/APAP 100-650 TAB TEV**
TEVA,USA
TAKE 1 TABLET EVERY 6 HOURS AS NEEDED FOR PAIN

Date:02-06-2006   DAW:0
Rx: C 753008 00

PRICE:   $22.79

NDC:00093-0890-05 Days Supply: 10 Refills: 0 **Qty:40**   TA
Prscbr: BEAUCHAMP, DLIVRO*
TP:   1

PAY:   $22.79
Caps:Y
Couns:N

Thank you for using a cost-saving generic

---

**CVS/pharmacy** #4869   Ph:334.271.5861   CUSTOMER R...

6990 ATLANTA HWY
MONTGOMERY, AL
36117-0000

07 0751654 00 0001149

**RHODES, FALICIA**
3 ANNE ST, OZARK, AL 36360-0000
Ph:334.000-0000   DOB:04-21-1970
**NAPROXEN 500 MG TABLET TEV**
TEVA,USA
TAKE 1 TABLET TWICE A DAY WITH MEALS

Date:01-27-2006
Rx: 751654 0...

PRICE:   $11.49

NDC:00093-0149-01 Days Supply: 10 Refills: 0 **Qty:20**   TA
Prscbr: DEJESUS, DANTE
TP:   1

PAY:   $11.4...
Caps:Y
Couns:N

Thank you for using a cost-saving generic

001489

---

## CVS/pharmacy ACTION NOTE

RHODES, FALICIA
RX: C 753008 00
PROPOXY-N/APAP 100-650 TAB TEV

Preferred Contact 334 000-0000
Qty: 40
Date 02-06-2006

☐   **Pharmacist must speak with Patient**

☐   **Out of Stock / Partial: Gave_____ + Due_____**
       Delivery Date:_____

☐   **Insurance Rejection**

   ☐   Refill Too Soon       Date Available _____

   ☐   Prior Authorization   ☐   Drug Not Covered

   ☐   Patient Not Covered

   ☐ **No Refill – Prescriber Contacted**

Notes: _____

_____

_____

### Customer Notification
       Date: _____ Time:_____

   ☐   Informed Patient at Drop Off

   ☐   Spoke to Patient on Phone

   ☐   Left Message with:_____

   ☐   **Need Preferred Contact # (___) ___-____**
                       *(Update Computer)*

Notes: _____

_____

Employee: JESSICA

---

*Your CVS Pharmacist can answer questions about your medications*

• Knowledgeable   • Caring
• Committed       • Confidential

**CVS/pharmacy**

001538

**CVS RapidRefill** ™

Avoid waiting for your prescription refills
Order your refills 24 hours per day/7 days per week

1.   Call your CVS/pharmacy.

2.   Enter your CVS prescription number.

3.   Enter the time you'd like to pick up
       your prescription.

Or online at www.cvs.com/pharmacy

Don't Wait, Order a Day Ahead

**DEFENDANT'S EXHIBIT**
5
PENGAD 800-631-6989

**RH**
02-05-2006



**CVS/pharmacy** #4869  Ph:334.271-5861    CUSTOMER REC

6990 ATLANTA HWY
MONTGOMERY, AL
36117-0000

07 0752930 00 0002469

**RHODES,FALICIA**
3 ANNE ST, OZARK, AL 36360-0000
Ph:334.000-0000         DOB:04-21-1970
**HYDROCODONE/APAP 5/500 TAB MCK**
M'CODOT SPEC
TAKE 1 TABLET EVERY 6 HOURS AS NEEDED

Date:02-05-2006    D
Rx: C 752930 00

PRICE:    $24.69

NDC:00406-0357-05 Days Supply: 10  Refill: 0  **Qty:40**   TA
Prscbr: BEAUCHAMP,DLIVRO*
TP:  1

PAY:    $24.69
Caps:Y
Couns:N

Thank you for using a cost-saving generic

---

## CVS/pharmacy ACTION NOTE

**RHODES,FALICIA**                  Preferred Contact 334 000-000
       RX: C 752930 00            Qty: 40
**HYDROCODONE/APAP 5/500 TAB MCK**   Date 02-05-2006

☐  **Pharmacist must speak with Patient**

☐  **Out of Stock / Partial: Gave_____ + Due_____**

       **Delivery Date:_____**

   **Insurance Rejection**

☐  Refill Too Soon        Date Available _____

☐  Prior Authorization    ☐  Drug Not Covered

☐  Patient Not Covered

☐  **No Refill – Prescriber Contacted**

Notes: _____

_____NEW CARD?_____

**Customer Notification**
       **Date: _____ Time:_____**

☐  Informed Patient at Drop Off

☐  Spoke to Patient on Phone

☐  Left Message with:_____

☐  **Need Preferred Contact # (___) ___-____**

                  *(Update Computer)*

Notes: _____

_____

_____

**Employee: BRANDY**

901 E. South Blv    Ste. A
Montgomery, AL 36116

## RECEIPT

Received From: *Falicia Rhodes*

For: *Ofc. Visit - follow up on Accident*

Amount: *$62.00*

Date: *3/2/06*    ☐ Cash    ☐ Cr

                                   *Chec*

Rec'd by: *Shunda*    *#2*



---

# CVS/pharmacy®
### Expect something extra™

6990 ATLANTA HWY, MONTGOMERY, AL
PHARMACY: 271-5861   STORE: 271-1207

REG#07 TRAN#1180 CSHR#273855 STR#4869

```
1 RX ITEM 0073975602        .00N
1 RX ITEM 0075293000      24.69N
CARD #: ********6052
```

2 ITEMS
```
        TOTAL           24.69
        CASH            30.00
        CHANGE           5.31
```

5486 9603 6118 0074
**RETURNS WITH RECEIPT THRU 04/06/2006**

FEBRUARY  5, 2006        1:14 PM

**ExtraCare balances as of 01/25**

1ST QTR NON-RX SPENDING:        3.85

CONTINUE EARNING EXTRA BUCKS
EVERYDAY!
EARN 2% BACK ON ALMOST EVERYTHING
IN THE STORE AND ON CVS.COM
IT'S FREE CVS MONEY!

**SHOP 24 HOURS A DAY AT CVS.COM**
THANK YOU FOR SHOPPING WITH US

---

# CVS/pharmacy®
### Expect something ex

6990 ATLANTA HWY, MONTGOMERY, AL
PHARMACY: 271-5861   STORE: 271-120

REG#08 TRAN#5585 CSHR#000021 STR#48

```
1 RX ITEM 0075300800      22.79N
1 RX ITEM 0075458700        .00N
```

2 ITEMS
```
        TOTAL           22.79
        CASH            53.00
        CHANGE          30.21
```

5486 9604 9558 5080
**RETURNS WITH RECEIPT THRU 04/19/20**

FEBRUARY 18, 2006       11:40 AM

# GET YOUR CVS EXTRACARE CARD

**SHOP 24 HOURS A DAY AT CVS.COM**
THANK YOU FOR SHOPPING WITH US

**Obelisk Healthcare, LLC**
**901 EAST SOUTH BLVD. MONTGOMERY, AL  36106**
**(334) 558-0262**

**02/09/2006  Excuse/Note**
    **Order**
    **To: WHOM IT MAY CONCERN**
    **Re: RHODES, FALICIA R 04/21/70**
       PLease allow Ms Rhodes off untill 02/12/06
       D'Livro Beauchamp, M.D.
       **Last Modified: 02/09/2006**



DEFENDANT'S
EXHIBIT
6

On Jan 27th I Falicia R. Rhodes went into the U.S. Postal Office Planatation Way. As I was appoarching my post box I slip and fall on a freshly mop and wax floor at that moment all my weight shifted to my left hip causing survive pain. I went to Baptist East for Medical treatment and X-Rays to make sure that everything was okay. On February 2 2006 I begain seeking treatment from Dr.D'Livro Beauchamp of the Obelisk Healthcare, LLC 901 East South Blvd.,Ste A Montgomery, Alabama.

I was suffering from headach, lower back pain and hip pain. Dr. Beauchamp wrote a perscription for LorTab for pain I had reaction to that med. Dr. Beauchamp then wrote a perscription for Hydrocodone/APAP 5/500 Also I was giving two more perscription for pain Propoxy-n/APAP 100-650 better known as Darvocet. Also I was giving Naproxen 500 MG by emergency room doctor. After seeing Dr. Beauchamp for three weeks he then sent me for Physical Therapyon February 22nd for two weeks. My Physcial Therapy ended on March 1st. I'm still suffering from a headache and I had to stop wearing high heels which apart of my every day arttire. I have had to adjust my foot wear due to the pain that is in my hip and lower back.

Here is a list of receipts where I have paid for my medical care:

| Cvs pharmacy Medical Center East | | Dr. D' Livro Beauchamp | | Physical Therapy | | Baptist |
|---|---|---|---|---|---|---|
| Perscriptions $22.79 $1,129.70 | | Check # 3063 $105.00 | | Check # 3076 $125.00 | | Balance |
| | $24.69 | Check # 3073 $124.00 | | Check # 3078 $125.00 | | |
| | $11.49 | Check # 3080 $ 62.00 | | Balance $425.00 | | |
| Total $1,129.70 | $ 58.87 | | $ 291.00 | | $ 675.00 | |

Grand Total   $2,154.57

DEFENDANT'S EXHIBIT
7
PENGAD 800-631-6989

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the ...uctions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPRO OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit To Appropriate Federal Agency:<br><br>**DISTRICT TORT CLAIMS OFFICE**<br>**UNITED STATES POSTAL SERVICE**<br>**351 24TH STREET NORTH, ROOM 329**<br>**BIRMINGHAM, AL 35203-9331** | 2. Name, Address of claimant and claimant's personal representative, if a (See instructions on reverse.) (Number, street, city, State and Zip Co<br>Falicia Rhodes, P.O. Box 211074<br>          Montgomery, AL 36121<br>Jay Lewis: Law Offices Of Jay Lewis<br>          P.O. Box 5059, Montgomery AL 361 |
|---|---|

| 3. TYPE OF EMPLOYMENT<br>☐ MILITARY ☑ CIVILIAN | 4. DATE OF BIRTH<br>4-21-70 | 5. MARITAL STATUS<br>Divorced | 6. DATE AND DAY OF ACCIDENT<br>1-27-06, Friday | 7. TIME (A.M. OR P.<br>2:30 p.m. |
|---|---|---|---|---|

8. Basis of Claim (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurence and the cause thereof) (Use additional pages if necessary.)

Claimant slipped and fell in USPS facility on Plantation Way in Montgomery, Alabama. Ther was fresh, still-wet wax on the floor. There were no warning signs or other devices present to inform claimant of danger. Claimant suffered injury to her hip and back.

*RECEIVED APR 0 5 2006 OPERATIONS PROCESS BIRMINGHAM AL 35203-9331*

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, street, city, State, and Zip Code)

Not Applicable

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. (See Instructic on reverse side.)

Not Applicable

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STA NAME OF INJURED PERSON OR DECEDENT.

Claimant suffered soft-tissue damage to her back and hip, requiring medical treatment and physical therapy. Claimant still has headaches, back pain, and hip pain. See letter from personal representative attached for more information on extent of damages.

| 11. | WITNESSES | |
|---|---|---|
| NAME | ADDRESS (Number, street, city, State, and Zip Code) | |
| Not Applicable | Not Applicable | |

| 12. (See instructions on reverse) | AMOUNT OF CLAIM (in dollars) | | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE<br><br>Not Applicable | 12b. PERSONAL INJURY<br>Lost Wages - $1212.84<br>Medical Exp.- $2154.00<br>Pain:Suffer-$21,633.16 | 12c. WRONGFUL DEATH<br><br>Not Applicable | 12d. TOTAL (Failure to specify may cause forfeiture of your rights.)<br><br>$25,000.00 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE ACCIDENT ABOVE AND AGREE TO ACCEPT SAI AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM

| 13a. SIGNATURE OF CLAIMANT (See Instructions on reverse side.)<br>Jay Lewis, (see authority) | 13b. Phone number of signatory<br>334-263-7733 | 14. DATE OF CLAIM<br>4-3-06 |
|---|---|---|

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM<br>The claimant shall forfeit and pay to the United States the sum of $2,000. plus double the amount of damages sustained by the United States. (See 31 U.S.C. 3729.) | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS<br>Fine of not more than $10,000 or imprisonment for not more than 5 years or bot ... 01.) |
|---|---|

DEFENDANT'S EXHIBIT

95-109
Previous editions not usable.

NSN 7540-00-634-4046

STANDARD FORM 95 (Rev. 7-85)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

# LAW OFFICES OF JAY LEWIS, LLC

**JAY LEWIS**
**CAROL GERARD\***
**K. ANDERSON NELMS**

**P.O. BOX 5059**
**MONTGOMERY, AL 36103**
**VOICE — 334-263-7733**
**FAX — 334-832-4390**

\* ALSO LICENSED IN CONNECTICUT, FLORIDA, NEW YORK

April 3, 2006

District Tort Claims Office
United States Postal Service
351 24ᵗʰ St. North, Room 329
Birmingham, AL 35203-9331



**RE: Claim of Falicia Rhodes**

Dear Sir or Madam:

On January 27, 2006, Ms. Falicia Rhodes entered the U.S. Post Office on Plantation Way in Montgomery, Alabama, where she maintains a box. Unbeknownst to Ms. Rhodes, the floor had just been waxed and was still wet. There were no pylons, signs, or other devices utilized to warn her of the dangerous condition of the floor.

Ms. Rhodes slipped in the still-wet wax, injuring herself and causing severe pain. She immediately sought examination and treatment at Baptist Hospital East. Fortunately, there were no fractures, and Ms. Rhodes was given naproxen sodium to relieve the pain. Ms. Rhodes' pain did not subside over the next several days, however, despite the fact that she stayed away from work for two weeks. Specifically, she suffered from headaches, lower back pain, and pain in her left hip. She sought further medical treatment from Dr. D'Livro Beauchamp, her personal physician. Dr. Beauchamp treated her with narcotic painkillers for several weeks, and finally sent her to physical therapy for a two-week course of treatment.

Ms. Rhodes completed her therapy on March 1, 2006, but she still suffers from headaches and pain in her lower back and hip. She can no longer wear high heels, and she has had to adjust her gait to accommodate the soreness.

As this matter sounds in negligence, it is actionable under the Federal Tort Claims Act. Pursuant to the Act, Ms. Rhodes demands compensation in the amount of $25,000. That amount is claimed to cover special damages (medical expenses) of $2,154.00, lost wages of $1,212.84 (time off work and time spent in therapy), and pain and suffering (past and future). SF-95 is enclosed.

Sincerely,

JAY LEWIS

encl: as above

cc: FTCA Officer, USPS, 6701 Wynton Blount Blvd., Montgomery, AL 36119-2500

TO WHOM IT MAY CONCERN:

This is to certify that Jay Lewis , attorney at law, is duly authorized to act as my legal representative with respect to a claim under the Federal Tort Claims Act for damages arising from my injury at a USPS facility in Montgomery, Alabama, on or about January 27, 2006.  Mr. Lewis is authorized to present a claim on my behalf and to carry out all other functions bearing on that representation.

Executed this 3rd day of April, 2006.


FALICIA RHODES


SWORN TO and SUBSCRIBED before me this 3rd day of April, 2006.


NOTARY PUBLIC, Alabama at Large

My commission expires _9/19/09_

RECEIVED
APR 0 5 2006
OPERATIONS PROGRAMS
BIRMINGHAM, AL
35203-9331

WOMEN of FAITH

Falicia Rhodes ⌐AL 114454 4·21·70
Ph. 334-396-0358
247 Eastdale Road South Apt B
Montgomery, AL 36117

3063

61-8752/2620

2 Feb 06

Date

Pay to the
Order of ___ **Obelisk Healthcare, LLC** ___ $ 105⁰⁰

One hundred and five dollars + 00/100 ____ Dollars

© HARLAND  BELIEVE

Security
Features
Details on
back

**ATCU**
Alabama Telco Credit Union
Montgomery, Alabama 36106.

For Dr appt _____  Falicia Rhodes        MP

⑆ 262087528 ⑆ 000001601807 9 ⑆ 3063

PENGAD 800-631-6989

**DEFENDANT'S
EXHIBIT**
9

Protect Your Duplicate Checks! Store all your duplicate checks in your check box.

☑ Track your expenses...  AL 1147454 4 2176
☐ Clothing  ☐ Food  ☐ Tran:  ion
☐ Credit Card  ☐ Utilities  ☐ Mortg.  ☐ TAX-DEDUCTIBLE ITEM
☐ Entertainment  ☒ Insurance  ☐ Other: _____

307

Obelisk Healthcare

One hundred and twenty five + 00/xx

Dr tppt

| BALANCE FORWARD | |
| THIS ITEM | |
| BALANCE | |
| DEPOSIT | |
| OTHER | |
| BALANCE FORWARD | |

For enhanced security, your name and account number do not appear on this copy

NOT NEGOTI

DO NOT USE FOR REORDERING PURPOSES
Protect Your Duplicate Checks Store your duplicate checks in your check box.

☑ Track your expenses...
☐ Clothing  ☐ Food  ☐ Transportation
☐ Credit Card  ☐ Utilities  ☐ Mortgage  ☐ TAX-DEDUCTIBLE ITEM
☐ Entertainment  ☐ Insurance  ☐ Other: _____

306:

Obelisk Healthcare

One hundred and five dollars + xx/oo

ch.app

| BALANCE FORWARD | |
| THIS ITEM | 105 00 |
| BALANCE | |
| DEPOSIT | |
| OTHER | |
| BALANCE FORWARD | |

For enhanced security, your name and account number do not appear on this copy.

NOT NEGOTIA

---

date 2 / 24 / 06 No.

received from Falicia Rhodes  125 00/xx

amount 125 00

for payment of Physical Therapy  InnerFit Physical Therapy

☐ cash  ☐ money order  ☐ credit card  ☒ check # 3078

| amount due | |
| amount paid | 125 00 |
| balance | |

from _____ to _____
signature _____

42SWS

---

date 2 / 22 / 06 No.

received from Falicia Rhodes  $125 00/xx
3076

amount 125 00

for payment of Physical Therapy  InnerFit Physical Therapy

☐ cash  ☐ money order  ☐ credit card  ☒ check # 3076

| amount due | |
| amount paid | 125 — |
| balance | |

from _____ to _____
red JoAnn
signature _____

42SWS

BELLTOWER HEALTHCARE, LLC
901 E SOUTH BLVD STE A
MONTGOMERY, AL 36116
(334)558-0262

Falicia Rhodes

2/2/06

| WAL00000 | WALK INS, | | 2/1/2006 | | 8:00:00 AM |

| EXAM | FEE | PROCEDURES | FEE | LABORATORY | F? |
|---|---|---|---|---|---|
| **New Patient** | | Anoscopy | 46600 | Aerobic Culture | 87070 |
| Problem Focused | 99201 | Arthrocentesis/Aspiration/Injection | | Amylase | 82150 |
| Expanded Problem, Focused | 99202 | Small Joint | *20600 | B12 | 82607 |
| Detailed | 99203 | Interm Joint | *20605 | CBC & Diff | 85025 |
| Comprehensive | 99204 | Major Joint | *20610 | CHEM 20 | 80019 |
| Comprehrnsive/High Complex | 99204 | Audiometry | 92552 | Chlamydia Screen | 86317 |
| Initial Visit/Procedure | 99025 | Cast Application | | Cholesterol | 82465 |
| Well Exam Infant (up to 12 mos.) | 99318 | Location   Long   Short | | Digoxin | 80162 |
| Well Exam 1 - 4 yrs. | 99382 | Catherization | *53670 | Electrolytes | 80005 |
| Well Exam 5 - 11 yrs. | 99383 | Circumcision | 54150 | Ferritin | 82728 |
| Well Exam 12 - 17 yrs. | 99384 | Colposcopy | *57452 | Folate | 82746 |
| Well Exam 18 - 39 yrs. | 99385 | Colposcopy w/Biopsy | *57454 | GC Screen | 87070 |
| Well Exam 40 - 64 yrs. | 99386 | Cryosurgery Premalignant Lesion | | Glucose | 82947 |
| | | Location(s): | | Glucose 1 HR | 82950 |
| **Established Patient** | | Cryosurgery Warts | | Glycosylated HGB (A1C) | 83036 |
| Minimum | 99211 | Location(s): | | HCT | 85014 |
| Problem Focused | 99212 | Curettement Lesion w/Biopsy | CTF | HDL | 83718 |
| Expanded Problem Focused | 99213 | Curettement Lesion w o/Biopsy | | Hep BSAG | 86278 |
| Detailed | 99214 | Single | *11050 | Hepatitis Profile | 80059 |
| Comprehensive/High Complex | 99215 | 2 - 4 | *11051 | HGB & HCT | 85014 |
| Well Exam Infant(up to 12 mos.) | 99391 | > 4 | *11052 | HIV | 86311 |
| Well exam 1 - 4 yrs. | 99392 | Diaphram Fitting | *57170 | Iron & TIBC   83540 | 83550 |
| Well Exam 5 - 11 yrs. | 99393 | Ear Irrigation | 69210 | Kidney Profile | 80007 |
| Well Exam 12 - 17 yrs. | 99394 | ECG | 93000 | Lead | 83655 |
| Well Exam 18 - 39 yrs. | 99395 | Endometrial Biopsy | *58100 | Liver Profile | 82977 |
| Well Exam 40 - 64 yrs. | 99396 | Exc. Lesion w/Biopsy | CTF | Mono Test | 86308 |
| | | w/o Biopsy | | Pap Smear | 88155 |
| **Obstetrics** | | Location   Size | | Pregnancy Test | 84703 |
| Total OB Care | 59400 | Exc. Skin Tags (1 - 15) | *11200 | Prenatal Profile | 80055 |
| Obstetrical Visit | 99212 | Each Additional 10 | *11201 | Pro Time | 85610 |
| **Injections** | | Fracture Treatment | | PSA | 84153 |
| Administration Sub. / IM | 90782 | Loc | | RPR | 86592 |
| Drug | | w/Reduc | w/o Reduc | Sed. Rate | 85651 |
| Dosage | | Fracture Treatment F/U | 99024 | Stool Culture | 87045 |
| Allegery | 95155 | I & D Abscess Single/Simple | *10060 | Stool O & P | 87177 |
| Cocci Skin Test | 86490 | Multiple or Comp | *10061 | Strep Screen | 86403 |
| DPT | 90701 | I & D Pilonidal Cyst Simple | *10080 | Theophylline | 80198 |
| Haemophilus | 90737 | Pilonidal Cyst Complex | 10081 | Thyroid Profile | 80091 |
| Influenza | 90724 | IV Therapy - To One Hour | 90780 | TSH | 84443 |
| MMR | 90707 | Each Addtional Hour | *90781 | Urinalysis | 81000 |
| OPV | 90712 | Laceration Repair | | Urine Culture | 87088 |
| Pneumovax | 90732 | Location   Size   Sim/Comp | | Draw ing Fee | 36415 |
| TB Skin Test | 86585 | Laryngoscopy | 31505 | Specimen Collection | 99000 |
| TD | 90718 | Oximetry | 94760 | | |
| Unlisted Immun | 90749 | Punch Biopsy | CTF | | |
| | | Rhythm Strip | 93040 | | |
| | | Treadmill | 93015 | | |
| | | Trigger Point or Tendon Sheath Inj. | *20550 | | |
| | | Tympanometry | 92567 | | |

**Diagnosis / ICD - 9**

I acknow ledge receipt of medical services and authorize the release of any medical information necessary to process this claim for healthcare payment only.

I ☐ do ☐ do not authorize payment to the provider

Patient Signature

Tax ID Number:
134277516
wk

Total
Estimated Charges:  105.—

Payment
Amount:  105.00

m MR# 3063

02/28/2006                        Financial Statement                        Page:
                                 Account #: 006222

                    INNERFIT WEST, LLC
                    7088 UNIVERSITY COURT
                    MONTGOMERY
                    AL                          36117
                    334-396-1400




          FALICIA RHODES
          POST OFFICE BOX 211074
          MONTGOMERY
          AL                          36121

     Fold Here                Fold Here                Fold Here
---------------------------------------------------------------------------------
Patient                       Account SS#
     Serv Date Inv# Description Of Services          Dr       Amount    Balance
---------------------------------------------------------------------------------
RHODES,FALICIA              006222
     02/22/06  0001 PT EVALUATION                    TML      115.00    115.00
     02/22/06  0002 THERAPEUTIC EXERCISES            TML       82.00    197.00
     02/22/06  0003 MANUAL THERAPY                   TML       43.00    240.00
     02/22/06  0004 ELECTRICAL STIMULATION           TML       31.00    271.00
     02/22/06  0005 CHECK PAYMENT                    TML     -125.00    146.00
     02/24/06  0006 THERAPEUTIC EXERCISES            TML       82.00    228.00
     02/24/06  0007 NEUROMUSCLUAR EDUCATION          TML       82.00    310.00
     02/24/06  0008 MANUAL THERAPY                   TML       43.00    353.00
     02/24/06  0009 ELECTRICAL STIMULATION           TML       31.00    384.00
     02/24/06  0010 CHECK PAYMENT                    TML     -125.00    259.00
     02/28/06  0011 THERAPEUTIC EXERCISES            TML       82.00    341.00
     02/28/06  0012 NEUROMUSCLUAR EDUCATION          TML       41.00    382.00
     02/28/06  0013 MANUAL THERAPY                   TML       43.00    425.00


     Current 31-60 Days 61-90 Days 91-120 Days  120+ Days   Total Ins  Total Due
      425.00      .00        .00        .00        .00         .00       425.00



DEFENDANT'S
EXHIBIT
10
PENGAD 800-631-6989